*In re* MARRIAGE OF HUMBERTO SUAREZ, Petitioner-Appellant, and ALINA A. SUAREZ, Respondent-Appellee.
Second District   No. 2—85—0847

Opinion filed October 20, 1986.

Howard A. London and Miles N. Beermann, both of Beermann, Swerdlove, Woloshin, Barezky & Berkson, of Chicago, for appellant.

Evan James Mammas, of Mammas & Goldberg, of Chicago, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

The petitioner, Humberto Suarez (Humberto), appeals from the judgment of the circuit court of Lake County dissolving his marriage to the respondent, Alina Font Suarez (Alina), and awarding certain property, maintenance, child support, and child custody to the parties. He also appeals from the trial court's denial of his motion to reopen proofs and denial of his post-trial motion. He contends the trial court abused its discretion in its division of marital assets between the parties; that the awards of maintenance and child support are unwarranted and should be reversed; and that the trial court's overvaluation of the primary marital asset, the Diesel Radiator Company, amounted to reversible error which requires remand for revaluation of that asset, and, necessarily, reconsideration of the awards of property, maintenance, and child support. Because we agree with the latter contention, we address only that issue.

The trial court heard evidence on February 13, 14, and 15, 1985. It found there were irreconcilable differences, that there was an irre-

trievable breakdown of the marriage, and that further attempts at reconciliation would be impracticable. It further found there was an agreement between the parties as to child custody. The court then proceeded to hear evidence concerning the division of property. After hearing the evidence the court asked the parties to submit various written appraisals along with a memorandum indicating the value of the marital assets and their proposed distribution of them, and it would decide the case.

The trial court's judgment dissolving the marriage was entered on June 20, 1985. It included the following awards and property division:

Child custody. By agreement, the parties were awarded joint custody of the minor children. Lisa, age 14, will reside with Humberto; Alina, age 10, will reside with Alina.

Maintenance and child support. Humberto was ordered to pay Alina rehabilitative maintenance of $4,000 per month for five years. He was also ordered to pay child support for the daughter, Alina, of $1,500 per month.

Property disposition.

| ASSET | WIFE | HUSBAND |
|---|---|---|
| Wife's bank account | $ 4,000 | |
| Wife's IRA account | 8,000 | |
| Wife's pension | 177,000 | |
| Florida condominium | 160,000 | |
| Florida home | 51,000 | |
| Oak Brook home | 226,000 | |
| Melrose Park Building | 181,000 | |
| One-half of stock Dreyfus fund | 55,000 | 55,000 |
| Cash value of wife's life insurance | 7,000 | |
| Mercedes Benz automobile | 30,000 | |
| Gold | 28,500 | |
| Husband's pension | | 193,000 |
| Husband's IRA accounts | | 6,000 |
| Note receivable | | 10,000 |
| Boat | | 32,000 |
| Bank accounts | | 12,000 |
| Cash value of life insurance | | 15,000 |
| Stock in Diesel Radiator | | 2,000,000 |
| | $927,500 | $2,323,000 |

"In order to make a fairly even property distribution," the trial

court ordered Humberto to pay Alina an additional $697,750 payable as follows: (a) cash in the sum of $397,750 upon entry of the judgment for dissolution of marriage; (b) a note for the balance of $300,000 to bear interest at the rate of 9% per annum with interest payments due monthly and a principal payment in the sum of $100,000 due on December 31 of each year commencing in 1985 until paid in full.

As noted, Humberto challenges the trial court's division of property, its awards of maintenance and child support, and its valuation of the Diesel Radiator Company in the amount of $2 million. Because the valuation of Diesel is integral to the remainder of the court's judgment, we proceed to examine the errors Humberto asserts cumulated to produce what he contends is an excessive valuation. Specifically, he contends that the court erred in (1) basing its valuation on evidence that was almost a year old and in refusing to reopen the proofs to consider new evidence that the company had lost a substantial percentage of its sales; (2) basing the valuation almost entirely on the present value of income to be generated by Humberto's post-dissolution labor; (3) relying on excessive projections of the company's future earnings; and (4) disregarding numerous other factors which depressed the value of the company.

Humberto and Alina Suarez, both 40 years old, each testified at trial concerning the inception of Diesel Radiator. The company now sells and repairs diesel radiators and filters for locomotives. The parties secured a $17,000 small-business loan and started the business as an equal partnership in 1970. Alina continued to work full-time at a printing company and worked part-time for Diesel doing paperwork, typing letters, and so forth. Humberto trained the men in the shop and used his mechanical-engineering background to set up the operations of the business. The parties' children were born in 1971 and 1975. Diesel Radiator was incorporated in 1975. Since about 1977 Alina worked full-time at Diesel and was involved mostly with customer contacts; she also took care of the company's finances: check writing, accounts payable and receivable, deposits and transfers in the bank. Humberto was in charge of the repairmen and running the repair facilities, he designed equipment and processes, and was responsible for the development of new accounts. According to the record, Humberto and Alina comprised the management of the company and served as its board of directors. They are assisted by a woman who does company bookkeeping, answers the phone, and handles customer inquiries in the Suarezes' absence. The company also employs a plant superintendent and 18 shop employees.

Humberto testified the most important function of the company

was the repair of locomotive radiators because in order to get the new radiator business "[y]ou first have to become established as a repairman." The company also sells filters, which he invented for radiators, but he testified that filter sales were "down to nothing right now." When he and Alina had disagreements concerning the operation of the business in 1984, they agreed to submit their disputes to an arbitrator. One of the decisions made by the arbitrator was that Diesel should proceed to contract with the New York and New Jersey Transit Authorities in connection with a new aspect of the business, which Humberto testified involves supplying the radiators and manufacturing and designing the structure where the radiators are going to be contained to be applied to the locomotive. He testified the prototype unit had been supplied to New Jersey and the New York prototype was being produced.

The record shows Humberto and Alina each received substantial salaries and benefits from Diesel for the fiscal years March 31, 1980, through March 31, 1984; respectively, $54,000, $42,000, $77,000, $78,000 and $140,000. The total salary of each for the 1984 calendar year amounted to $173,000.

Two expert witnesses testified as to the value of the stock of Diesel Radiator. Humberto presented the testimony of Hugh B. McCulloch, who had valued the stock at the request of Humberto's attorney and Alina's former attorney with the view that it might serve as the basis for discussions leading toward one party's acquisition of the interest of the other. In McCulloch's opinion, the fair market value of the stock was $600,000. Alina's expert, Patrick M. Dutcher, testified that the stock was worth $2,832,532. The trial court's judgment valued the company at $2 million.

Mr. McCulloch, a business appraiser for over 20 years, prepared a 13-page written valuation report, dated April 27, 1984, which was admitted in evidence. It showed McCulloch's opinion included consideration of a number of factors such as the nature and history of the business, the products and services it offers, the economic outlook, the outlook for the company and the industries served by the company, its financial condition, competition, management, and earnings capacity. In developing his opinion, he also reviewed Diesel Radiator's unaudited financial statements and Federal income tax returns for the fiscal years which ended on March 31, 1979, through March 31, 1983, inclusive, and the unaudited interim financial statements covering the accounting periods which ended on November 30, 1983, and on February 29, 1984. In addition, he visited the company facilities in Melrose Park, observed its operations, and met separately with both the

Suarezes. McCulloch testified at trial that in evaluating a business: "[You] don't start with numbers ***. [You] come with more than 20 years' experience in the field of selling businesses and valuating businesses and knowing how you look at a business and meld all these factors together in your mind and come up with a judgment, not a mathematical process. *** It is an art."

Alina presented the testimony of Patrick Dutcher, a certified public accountant specializing in the valuation of businesses. He testified he began his valuation of the company in late January 1985. He reviewed five years' past corporate income tax returns and associated financial statements, the latest monthly financial statement being an October 1984 report, other various documents, and McCulloch's evaluation of the company. He visited the Diesel Radiator plant and talked with Alina. He did not speak with Humberto, although he thought that would have been a prudent thing to do. He did not talk with any of Diesel's customers and attempted to but did not talk to any of Diesel's competitors.

Dutcher testified he valued the company using two different methods which he felt proved one another out. The first was the "formula method." Dutcher explained that, under that method, he determined the current value of assets on hand plus intangibles such as goodwill, or excess earning capacity, and compared that value to the statistics compiled through corporate income tax returns filed by similar businesses in the same industry. The second method Dutcher used was called the "net present value discounted cash flow" method. Under that method, he attempts to forecast a corporation's future stream of earnings based upon the earnings actually realized by the corporation in the recent past and then reduces this stream to its present-day equivalent using a reasonable and acceptable discount rate. Dutcher explained:

> "The essence of the net present value method is that over a period of time, in the future, if the business can generate X number of dollars, what's that worth today? We use capitalization rates based on the risk associated with that uncertainty of the future period in time, the risk in the industry, and so forth."

He testified the net-present-value method was probably the most acceptable method for determining whether or not to buy a business. He felt the "book value" was inappropriate in this case since book value generally has application to a liquidation-type situation, whereas Diesel has substantial earnings capacity. He also found inappropriate the price/earnings ratio method since the company has no publicly

traded stock.

Using the "net present value discounted cash flow" method, Dutcher arrived at a value of $2,832,532. A 12-year cash-flow forecast was calculated for the period 1984 to 1995. The cash flow was reduced to today's present value by applying a growth rate of $9\frac{1}{2}\%$ (comprised of $4\frac{1}{2}\%$ real growth in the industry plus a 5% inflation rate) and a present-value discount rate of 20%. Using the formula method, Dutcher arrived at a value of $2,222,079. Dutcher testified he was confident the value of the corporation was certainly within that range of values and that in his opinion Diesel Radiator's value was $2,832,532.

Dutcher acknowledged that Diesel Radiator's main customer was the Burlington Northern Railroad Company. McCulloch's report, which Dutcher reviewed, indicated that for the fiscal year 1983, 62.9% of Diesel Radiator's sales were to the Burlington Northern. That constituted 62.5% of Diesel Radiator's net sales in new radiators, 35.7% of its radiator-repair income, and more than 95% of its filter sales. Dutcher testified that it is significant that one particular customer is such a large purchaser and that his valuation would change if Diesel Radiator lost the Burlington Northern account and could not replace those lost sales. He chose the 20%-present-value-discount factor based on his opinion of the risks of uncertainties in the future. He agreed that someone else might use a 15%-discount factor and that someone else again might use a 30%-discount factor.

Humberto testified in rebuttal that 50% of Diesel Radiator's profits in 1984 resulted from filter sales and that filter sales had since ended because the Burlington Northern and a smaller customer cancelled their orders. Those lost profits totaled $243,246. Humberto also testified that the contract for the sale of new radiators to the Burlington Northern is renewable on a yearly basis and can be revoked at any time. Furthermore, Diesel Radiator's repair business is going to decrease because of the invention of new type of radiator that does not need repairs. McCulloch's report identified this competitive influence as "a premium-priced radiator made from seamless tubing which is mechanically bonded to the radiator header, thus eliminating the use of solder, the source of most of the problems leading to radiator repairs." McCulloch's report also indicated that the manufacturers of this new radiator are selling them directly to locomotive manufacturers and selling them directly to railroads to cover their replacement needs as well. Diesel Radiator is only able to offer the traditional and less expensive soldered radiators.

After the court distributed to the parties its handwritten notes in-

dicating what its decision was, but before entry of the judgment order drafted by Alina's attorney, Humberto filed a motion to reopen proofs *inter alia* to show that the Burlington Northern had recently decided not to purchase its new radiators from Diesel for 1985, resulting in a substantial loss of business to the company. The court denied the motion to reopen the proofs and on June 20, 1985, entered the judgment submitted by Alina's attorney. The judgment did not become final, however, until August 12, 1985, when the reserved issue of attorney fees was finally settled.

In his post-trial motion, Humberto again argued that the trial court should reconsider its decision in light of Diesel Radiators substantial loss of business from Burlington Northern. The court refused to consider any new evidence, but did allow Humberto to make an offer of proof. The offer of proof showed (1) Burlington Northern's May 22, 1985, notice to Diesel Radiator that it would not be purchasing new radiators from it in 1985; (2) that Diesel Radiator's 1984 profits from the sale of such new radiators to the Burlington Northern totaled $106,346; (3) that filter-sales profits dropped to zero after April 1985, down from $94,540 for the period April 1984 through March 31, 1985, and down from $246,238 for the previous fiscal year; and (4) a recalculation of the value of Diesel Radiator Company in light of the loss of the Burlington Northern sales. The recalculation utilized the same two valuation methods used by Dutcher, but excluded past profits (and related taxes) attributed to the lost filter and radiator sales, and excluded the value of the Diesel Radiator Melrose Park building, which was otherwise included separately in the court's listing of marital property. The recalculation of the "net present value discounted cash flow" method yielded a value of $786,210, and the recalculation of the formula method yielded a value of $511,272. The trial court refused to consider the offered evidence and denied Humberto's post-trial motion.

Humberto contends that because marital property must be valued as of the date of the dissolution of the marriage (*In re Marriage of Frazier* (1984), 125 Ill. App. 3d 473; see also *In re Marriage of Rubinstein* (1986), 145 Ill. App. 3d 31; *In re Marriage of Rossi* (1983), 113 Ill. App. 3d 55), the court committed reversible error in denying his motion to reopen proofs to consider the new, current evidence as to the value of the business, and the court's error resulted in an overvaluation of Diesel Radiator of at least $1,213,790. Humberto asserts that the court, in effect, abused its discretion by failing to exercise its discretion in denying the motion to reopen, since the court erroneously concluded that it could not consider evidence of an event which

occurred subsequent to the trial.

Alina argues the court was correct in refusing to reopen the case for the submission of new, additional testimony as to an event which occurred subsequent to the date of trial. She asserts Humberto surely must have been negotiating a contract with the Burlington Northern prior to the close of proofs here on February 15, 1985, and could have testified as to the progress of the negotiations. She contends Humberto cannot be allowed to bring forward new evidence after the court renders a decision with which he is not satisfied. Further, she contends Humberto has not been caused any substantial injustice by the court's refusal to admit the new evidence since Diesel has other customers and Dutcher's use of a 20%-present-value-discount rate took into consideration the substantial amount of income earned from the small number of business customers. Alina argues Humberto had ample opportunity to present evidence at trial and that permission to present new evidence would have subjected the parties and the trial court to lengthy procedures which would lead to a retrial of the entire case. Finally, she asserts Humberto failed to present credible testimony as to the value of Diesel Radiator and may not be allowed to benefit on remand from his failure to do so.

■■ ■ Generally, in considering a motion to reopen proofs, the trial court should take into account whether there is some excuse for the failure to introduce the evidence at trial, whether the adverse party will be surprised or unfairly prejudiced by the new evidence, and whether there are the most cogent reasons to deny the motion. (*In re Marriage of Weinstein* (1984), 128 Ill. App. 3d 234, 249.) The decision to deny such motions is within the sound discretion of the trial court and will not be disturbed on review absent a clear abuse thereof (128 Ill. App. 3d 234, 249), and where the failure to reopen the proofs resulted in substantial injustice. (*In re Marriage of Holder* (1985), 137 Ill. App. 3d 596, 603; *In re Marriage of Smith* (1983), 114 Ill. App. 3d 47, 52.) As Humberto notes, greater liberty should be allowed in the matter of opening the proofs when the case is tried before the court without a jury, as was the case here. *Harper v. Johnson* (1978), 61 Ill. App. 3d 190, 193, citing *People ex rel. Boos v. St. Louis, Iron Mountain & Southern Ry. Co.* (1917), 278 Ill. 25, 28-29.

Although we agree that parties should not be allowed to benefit on review from their failure to introduce evidence at trial (*In re Marriage of Mullins* (1984), 121 Ill. App. 3d 86, 90; *In re Marriage of McCartney* (1983), 116 Ill. App. 3d 512; *In re Marriage of Smith* (1983), 114 Ill. App. 3d 47, 54-55), it is clear that the evidence of the loss of the Burlington Northern new-radiator bid occurred in the interim per-

iod between the close of proofs and the entry of the judgment of dissolution, and there is no evidence whatever that Humberto was "negotiating" with the Burlington Northern on the contract prior to the trial as opposed to simply participating in competitive bidding.

We note that Alina appears to construe the "valuation" date at bar as the date of the hearing in February 1985 rather than the date on which the court's judgment of dissolution was entered on June 20, 1985. In *In re Marriage of Rossi* (1983), 113 Ill. App. 3d 55, 60, the court noted that facts existing on the valuation date should be the only ones taken into account because "[t]o hold otherwise would have the effect of treating appreciation of the corporation subsequent to the dissolution as marital property contrary to section 503(c)(3) of the [Illinois Marriage and Dissolution of Marriage] Act. Ill. Rev. Stat. 1981, ch. 40, par. 503(c)(3)." (Accord, *In re Marriage of Brooks* (1985), 138 Ill. App. 3d 252, 260.) *Rossi* found the proper valuation date there to be January 30, 1979, the date on which the judgment of dissolution of marriage was entered in that case, and not the later date of June 22, 1981, or December 1, 1981, on which dates supplemental judgments concerning property settlement, maintenance, and attorney fees were entered.

In this case, the court did not enter a judgment of dissolution after the hearing in February and then later enter a supplemental judgment after property-division issues had been resolved. It entered both its judgment dissolving the marriage and settling the matters of custody, child support, maintenance, and property division on June 20, 1985. Its reservation of the issue of attorney fees was later decided on August 12, 1985. Accordingly, the proper valuation date here was June 20, 1985, and the loss of the Burlington Northern business was an occurrence which had a bearing on the value of Diesel Radiator as of the date of dissolution.

As to whether the court's refusal to reopen caused Humberto substantial injustice, we note that although Dutcher testified the 20%-present-value-discount factor he chose took into consideration the substantial amount of income generated yearly from the small number of business customers, he also acknowledged the subjective nature of the selection of that particular factor as opposed to a lower or higher one. The proffered recalculations of the "net present value discounted cash flow" method and the formula method, adjusted in part to reflect the loss of this Burlington Northern business, show a tremendous difference in the valuation thereby derived from the valuations arrived at by Dutcher. In Dutcher's original valuations the "net present value discounted cash flow" method yielded a valuation of $2,832,532 com-

pared with the revised valuation of $786,210; Dutcher's original valuation using the formula method yielded a value of $2,242,079, and the revised valuation was $511,272. The notable difference between these figures suggests that the 20%-present-value-discount factor chosen by Dutcher was perhaps not realistic enough to account for the intense concentration of business attributable to this one customer, particularly in light of the relatively limited range of products and service offered by the company.

Dutcher acknowledged that lost sales from the loss of any one client, if they were not picked up by someone else to generate similar earning streams, would certainly affect his valuation figures. While Diesel Radiator does have customers other than the Burlington Northern, the evidence showed that for the 1984 base year—which year was an integral part of Dutcher's "net present value discounted cash flow" method—Burlington Northern's business accounted for 62.5% of Diesel's new-radiator sales and for 95% of its total filter sales. Moreover, according to Humberto's testimony, 1984 was also Diesel Radiator's "best year ever." Humberto testified at trial concerning the total loss of the filter business since Diesel had lost the accounts of both Burlington Northern and its one other filter customer. The only evidence that some of these lost profits may be recaptured was the two new contracts with the New York and the New Jersey Transit Authorities, which were expected to produce perhaps $25,000 in profits in 1985. Further, the Milwaukee Road recently purchased 10 filters. Although two of the railroads, the Illinois Central and the Santa Fe, have been considering use of Diesel's filters for the past three years and for the past two years, respectively, Humberto testified they have been unable to make a decision to buy or not. Humberto testified also he had been talking with a lot of people trying to promote his products, and that he had made a proposal in September 1984 to the General Motors Diesel Division in Canada relative to filters. Other evidence tending to offset those potential profits was offered regarding the new type of radiators being manufactured that do not require repairs and which come out of the factory with a filter already applied. We note McCulloch's valuation also recognized that, although there was then "no present reason to be concerned about the relationship" between Burlington Northern and Diesel Radiator, "with one customer taking over 60% of Diesel Radiator's net sales, the 'fair market value' of Diesel's Radiator stock would be somewhat adversely affected by the business concentration." McCulloch's report also noted that the number of Diesel's competitors has tripled since its inception in 1970.

The issue of reopening proofs in the context of a dissolution proceeding in an Illinois case was recently presented in *In re Marriage of Weinstein* (1984), 128 Ill. App. 3d 234. The wife there argued the court erred in denying her post-trial motion to reopen proofs to hear additional evidence which required a modification of the court's dissolution judgment. Specifically, she wished to reopen proofs to present evidence that she had lost her job, that the husband was about to enter the job market as a surgeon, and that the husband had breached an out-of-court agreement to obtain a Jewish divorce. After reviewing the general rules relating to the reopening of proofs, the *Weinstein* court concluded the trial court did not abuse its discretion in denying the motion since it determined that the evidence the wife sought to introduce was not of the utmost importance to her case and likely would not have materially altered the trial court's judgment. The trial court had already awarded her substantial marital assets (62% of the marital estate) in light of the parties' disparate earning capacities, and the record showed her loss of employment was only a temporary setback in her several years of professional experience which was occasioned by economic reversals of the company where she had been employed. We find the facts of the instant case distinguish it from *Weinstein*, however, in that we believe the evidence of the loss of the Burlington Northern radiator business was a significant factor which both experts agreed would affect the value of the business. We note also the evidence offered in *Weinstein* occurred subsequent to the entry of the judgment of dissolution, whereas the evidence offered here occurred prior to the entry of the dissolution judgment.

Two out-of-State cases have considered the reopening of proofs under circumstances very similar to those presented here, and we find them persuasive. The first one, cited by Humberto, is *In re Marriage of Rives* (1982), 130 Cal. App. 3d 138, 181 Cal. Rptr. 572. The court in *Rives* found it was error for the trial court to refuse to reopen proofs after submission of the case, but prior to entry of the judgment, to consider the devaluation of the parties' queen bee business due to the wife's neglect. Also, in *F. v. F.* (Del. 1976), 358 A.2d 714, the court found that where, after the trial court valued the corporation owned by the husband as sole stockholder, the husband entered into an agreement to sell the corporation for about four times the value used by the court as the basis for the property division, the trial court erred in refusing the wife's application to reopen the hearing to submit evidence as to the sale. The court wrote:

> "Given the equitable nature of the proceeding, the time at which the application was made (before final order), the total

amount of property involved in the proceeding, and the substantial difference between the asset and sale value of the business, we conclude that the application [to reopen proofs] should have been granted. We emphasize that not every post-hearing change in asset value requires reexamination, or an evidentiary hearing, but the difference here was so substantial that the Court, which was still attempting to finally settle the property issues, should have determined to what extent, if any, the sale price required a change in its award. Failure to do so was, in our view, an abuse of discretion." *F. v. F.* (Del. 1976), 358 A.2d 714, 716.

■ We find the reasons underlying the court's decision in that case are readily applicable to the case presently before us. We believe evidence of the loss of the Burlington Northern radiator sales, which was not available at the time of the hearing but which became known before the judgment of dissolution was entered, was a significant factor which had a substantial bearing on the valuation of the company as of the date of the dissolution, and it was an abuse of the trial court's discretion to deny the opening of the proofs.

■ Accordingly, the judgment concerning property division will be vacated and the cause remanded for rehearing to reconsider valuation of the business in light of the loss of the Burlington Northern new-radiator sales. Because the trial court's reconsideration of the evidence of valuation may affect its ultimate division of marital property between the parties, other portions of the judgment awarding maintenance and child support will also be vacated for redetermination after division of the marital property is effected. *In re Marriage of Rubinstein* (1986), 145 Ill. App. 3d 31, 38; *In re Marriage of Rapacz* (1985), 135 Ill. App. 3d 1045, 1051; *In re Marriage of Malters* (1985), 133 Ill. App. 3d 168, 183; *In re Marriage of Wilson* (1982), 110 Ill. App. 3d 809, 815-16.

■ Because the cause is being remanded, we find it necessary to address several errors raised by Humberto with regard to the alleged overvaluation of Diesel Radiator. He argues that Dutcher's formula method—net tangible assets ($515,479) plus goodwill ($1,726,600) equals value ($2,242,079)—erroneously included the parties' personally owned real estate (the Melrose Park building valued at $185,000) as a corporate asset. The record shows the Melrose Park building was also valued separately as a marital asset awarded to Alina. Similar double counting of the same asset has been found to be reversible error since it causes an overstatement of the parties' assets. (*In re Marriage of Malters* (1985), 133 Ill. App. 3d 168, 180-81; see also *In re Marriage*

*of Wilson* (1982), 110 Ill. App. 3d 809, 815.) We agree the Melrose Park building should not have been included as part of the corporation's net tangible assets. Alina's argument that Diesel derives economic value by having this asset available to itself is without merit. The record is clear that the corporation pays substantial, even excessive, rent for the use of the building pursuant to lease. As such, the building lease represents a liability of the corporation, not an asset.

Humberto next contends that Dutcher's formula and "net present value discounted cash flow" methods of valuation were further invalidated by the failure of each of those methods to take into account the cost of hiring qualified personnel to replace Humberto and Alina. He contends failure to incorporate this cost into the valuation methods caused a greatly inflated estimation of Diesel's adjusted taxable income. This, in turn, affected the goodwill factor included in the formula method and his valuation based on the "net present value discounted cash flow" method.

Humberto points out that McCulloch's report indicated that if Diesel Radiator were to be sold to an investor/owner who would not be involved in the day-to-day operations of the business, that person would necessarily be required to retain management personnel possessing engineering and sales skills at an estimated total compensation package of $200,000. McCulloch also opined that if one or the other of the Suarezes were to continue the business without the assistance of the other, either a highly skilled engineer or a highly skilled salesperson would undoubtedly need to be hired to replace the Suarez no longer with the company. However, the compensation paid to that person would be far less than the compensation previously paid to either one of the Suarezes. McCulloch's report did not suggest what the range of such compensation might be.

■ Humberto asserts the trial court's judgment "correctly" found fault with Dutcher's valuation since it "[failed] to consider the loss of one of the two major employees and the value of the services performed by the other." Humberto points out, and we agree, that the opinion of an expert is of value only when it is based upon and in harmony with facts which are capable of verification by the court. (*Yowell v. Hunter* (1949), 403 Ill. 202, 214; *St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 179.) According to the record at trial, however, Humberto testified he found it unnecessary to hire anyone to replace Alina during her extended absence from the company, and that he and the clerk were able to assume her responsibilities. He testified that during the last year, he carried on all the functions that Alina did in the past, and

testified that he could do it in the future as well. In view of these facts, we cannot find error in Dutcher's failure to take replacement compensation into account.

Humberto also charges that Dutcher's opinion as to the value of Diesel Radiator was deficient not only because he was unaware of the loss of the Burlington Northern radiator sales and the loss of the filter sales, but because his use of such valuation methods did not allow consideration of factors such as the history of the business, the lack of management depth, and the company's position relative to its competitors. He points out such factors are termed "fundamental" in Revenue Ruling 59-60 (Rev. Rul. 59-60, 1959—1 C.B. 237).

In *In re Marriage of Rossi* (1983), 113 Ill. App. 3d 55, 60, the court acknowledged:

> "The Internal Revenue Service has recognized that the general approach, method and factors outlined in Revenue Ruling 59-60 may be relevant in determining the fair market value of business interests of any type. (Rev. Rul. 59-60, 1959—1 C.B. 237.)"

Coincidentally, Hugh McCulloch was petitioner's expert in that case, and he relied on Revenue Ruling 59-60 in formulating his opinion of the value of the closely held corporation which was at issue there. Although the court apparently found no fault with use of the Revenue Ruling factors in valuing the corporation, it noted that it has been held that precise rules for determining the value of closely held stock cannot be laid down, citing *In re Marriage of Mitchell* (1981), 103 Ill. App. 3d 242, 248. The court found that in valuing the corporation, McCulloch failed to consider several of the factors or directly contravened them, and determined the cause should be remanded where the respondent's certified public accountant placed the corporation's net worth at slightly over one-half of McCulloch's valuation.

■ We believe the extent to which Dutcher's valuation of Diesel Radiator did or did not take into account the history of the company, management depth, and so forth, was fully covered on Humberto's cross-examination of him and it was within the trial court's discretion to accept or reject it. In the *Mitchell* case, which was cited by the *Rossi* court, it was stated that "every relevant evidential fact entering into the value of the corporate property reflecting itself in the worth of the corporate stock should be considered." (*In re Marriage of Mitchell* (1981), 103 Ill. App. 3d 242, 248.) The *Mitchell* court also emphasized the court's broad discretion in the disposition of property. Clearly, the trial court here heard the evidence and ultimately discounted Dutcher's valuation by some $832,000 due in part, perhaps,

to the shortcomings alleged here.

Humberto also contends the court's valuation of Diesel Radiator was excessive for the additional reason that it improperly included the value of income to be generated by Humberto's post-dissolution labor. He cites in support *In re Marriage of Frazier* (1984), 125 Ill. App. 3d 473. In that case the court assigned a value of $144,491 to the husband's insurance agency, which it had classified as marital property. It awarded the agency to the husband and ordered him to execute a $40,000 note, payable over five years at 10½% interest as the wife's share of that asset.

The $144,491 value assigned was based on the testimony of Dr. James P. Jennings, who used what is known as the "capitalization of earnings technique" in arriving at the worth of the agency. Jennings noted in his testimony:

"[The capitalization-of-earnings technique] is a broadly accepted method of determining value. Its premise is that the value of any income producing resource is not the historic cost of assets, nor is it the historic cost of assets minus liabilities. It is instead the discounted present value of the future stream of earnings, estimated by the use of recent past earnings." *In re Marriage of Frazier* (1984), 125 Ill. App. 3d 473, 475.

Clearly, the technique used by Jennings is essentially the same method used by Dutcher in arriving at his $2,832,532 valuation of Diesel Radiator. A major distinction between the calculations used in *Frazier* and those used here appears to be that Jennings used as a factor in his calculations Frazier's average annual net after-tax income for the five-year period 1976 through 1980. In contrast, Dutcher used not only the combined "officer compensation" of the Suarezes, but also did not use a five-year average of those combined salaries; instead, he used only the 1984 "best year ever" figure. *Cf. In re Marriage of Kapusta* (1986), 141 Ill. App. 3d 1010 (best to make capitalization-of-earnings calculation using an average of annual earnings over a period of several years to reduce the impact of unusual financial successes or setbacks).

That aside, the *Frazier* court determined:

"In valuing the agency at the discounted present value of the respondent's expected future earnings, Dr. Jennings ignored the fact that those earnings will be due in large part to the respondent's activity following dissolution. In failing to reduce the value of the agency to account for that activity the court effectively classified as marital property the results of the respondent's future efforts to maintain his current accounts. Fur-

thermore, the twin assumptions, implicit in Dr. Jennings' calculations, that the respondent's office expenses and commissions from policies written or assigned during marriage will remain constant, seem to be unwarranted. These shortcomings produced, in our opinion, a grossly excessive valuation of the agency as a marital asset. This cause must therefore be remanded for revaluation and redistribution of the value of the agency in accordance with the views expressed herein." *In re Marriage of Frazier* (1984), 125 Ill. App. 3d 473, 476-77.

Humberto contends that, because Diesel Radiator's future earnings will depend largely on his post-dissolution efforts, the court should have discounted the value of the company to reflect that fact. Alina argues the *Frazier* rationale is inapplicable, however, since Diesel Radiator is not a service-oriented business like the insurance agency in *Frazier* or like a dentist's, doctor's or lawyer's practice which relies solely upon the continuous "personally produced" services of one person. Rather, as a similar distinction was recognized in the case *In re Marriage of Rowe* (1985), 130 Ill. App. 3d 689, *appeal denied* (1985), 106 Ill. 2d 559, Diesel Radiator is a well-established, ongoing business with inventory, equipment, and employees which would not disappear as an entity if Humberto sold and left the business. Stated otherwise, as in *Rowe*, Alina contends Diesel Radiator is marketable and would have a present value if offered for sale at the time of dissolution. The *Rowe* court found that the rationale of *Frazier* was not applicable to the valuation of the uniform businesses at issue before it given these differences.

Humberto suggests that Diesel Radiator falls somewhere between *Frazier* and *Rowe* and asserts that application of *Frazier* would not require the trial court to disregard Diesel's earning potential entirely, but it would, however, preclude the court from including the value of Humberto's post-dissolution efforts in its valuation of the company. He notes that all businesses depend to some extent on personal efforts. Some businesses, such as the insurance agency in *Frazier*, might depend entirely or almost entirely on a particular person, whereas other businesses, such as the one in *Rowe*, may depend primarily on particular products. Diesel Radiator depends partly on Humberto's future personal efforts and partly on the particular products produced by the company.

■ We agree with Humberto's reading of *Frazier*, since it is clear the court intended that the appreciation in value of an asset which is accomplished by the post-dissolution efforts of one party should not inure to the benefit of the other party. We decline to read

*Rowe* to mean that such post-dissolution efforts may be treated as part of the marital property to be divided at dissolution. Rather, we believe the "earning potential" which may be considered properly by the court is that potential which may be said to have arisen out of the parties' past joint efforts and which, in sum, constitutes the business' goodwill.

"Good-will value is based upon earning potentiality in excess of normal return on tangible assets. It means the existence of intangible values in the business, such as a trade name of good repute, location, or uniqueness of product." *Securities Realization Co. v. Peabody & Co.* (1939), 300 Ill. App. 156, 171.

Calculation of the goodwill factor using the potential-income approach, based entirely upon the expectation of future efforts of one of the parties, was also disapproved in *In re Marriage of Rives* (1982), 130 Cal. App. 3d 138, 149-50, 181 Cal. Rptr. 572, 577-78. That court stated:

"The concept of goodwill in a marital dissolution context is elusive. * * * Essentially, goodwill in a dissolution context is a portion of the value of the [business] as a going concern." 130 Cal. App. 3d 138, 149, 181 Cal. Rptr. 572, 577.

One reason the court in that case found that the expectancy of future interests should not be the basis for determining the value of goodwill in a business which is marital property was because such marital property "may be acquired only during the marriage and it would be inconsistent with that philosophy to assign value to the post-marital efforts of either spouse." (130 Cal. App. 3d 138, 150, 181 Cal. Rptr. 572, 578.) The court also found the accountant's valuation of goodwill was based upon assumptions which were not proved in the record and that the potential-income approach completely ignores important considerations which may be said reasonably to contribute to, diminish, or affect the intangible value of goodwill at the time of dissolution.

■ Although we agree that the value of Humberto's post-dissolution efforts should not be included in the valuation of the business as a martial asset, we are unable to find the trial court's judgment here was erroneous on that basis, however, since it is not clear that the court's $2 million valuation did include Humberto's post-dissolution efforts. Obviously the court did not blindly accept Dutcher's "net present value discounted cash flow" valuation ($2,832,532), nor did it accept entirely Dutcher's "formula" method which included calculation of goodwill on historical production and income figures ($2,242,079). Accordingly, no reversal on this basis would be warranted.

For the reasons above, the judgment of the circuit court of Lake County is reversed, and the cause is remanded for further proceedings consistent with this opinion.

Judgment reversed; cause remanded.

HOPF and SCHNAKE, JJ., concur.