## NORTHEAST DISTRIBUTION, INC. *v.* PREMIER LOGISTICS SERVICES, INC., ET AL.*

## PREMIER LOGISTICS SERVICES, INC. *v.* NORTHEAST DISTRIBUTION, INC.

## GIRARD A. ROBITAILLE, SR., ET AL. *v.* NORTHEAST DISTRIBUTION, INC., ET AL.

## PILOT AIR FREIGHT CORPORATION *v.* NORTHEAST DISTRIBUTION, INC., ET AL.

## PREMIER LOGISTICS SERVICES, INC. *v.* AAA COOPER TRANSPORTATION

## NORTHEAST DISTRIBUTION, INC. *v.* PREMIER LOGISTICS SERVICES, INC.

Superior Court, Judicial District of New Britain

File Nos. CV-00-0505085S, CV-02-0518276S, CV-02-0518275S, CV-01-0511940S, CV-02-0513169S

---

* An appeal to the Appellate Court by the plaintiff in this docket number was filed on August 24, 2004; Appellate Court Docket No. AC 25749. On September 13, 2004, the appeal was withdrawn.

Memorandum filed July 14, 2004

*Vitrano, Preleski & Wynne,* for the plaintiff in the first case.

*John D. McNally,* for the defendants in the first case and the defendant Premier Logistics Services, Inc., in the fourth and fifth cases, and for the plaintiff in the second case and the plaintiffs in the third case.

*Salvatore Vitrano,* for the defendant in the second case and the defendants in the third case, and the defendant Northeast Distribution, Inc., in the fourth and fifth cases.

*Bonnie D. Kumiega & Associates,* for the plaintiff in the fourth case.

*Brian S. Cantor,* for the plaintiff in the fifth case.

COHN, J. These cases arose on the termination of Premier Logistics Services (PLS), a division of Northeast Distribution, Inc. (Northeast), and on the initiation of a corporation, Premier Logistics Services, Inc. (PLS, Inc.). A decision written by Judge Winslow in denying

a request by Northeast for a prejudgment remedy in Docket No. CV-00-0505085S, dated June 20, 2001, adequately summarizes the basic facts in these matters. "[Northeast] initiated a division called Premier Logistics Services in October, 1997. Northeast hired the defendants, Brian Nadeau and Girard A. Robitaille, Jr., to initiate the business of the subdivision. Since Nadeau and Robitaille were skilled in operations but not in marketing and sales, Girard A. Robitaille, Sr., was hired early in 1998 to solicit customers. All three of these defendants had been employed previously by Trans Advo, a company in a similar field of work. The defendant, David Francis, was added as an employee in early 1999; the defendant, Craig Allan, joined as an employee in the fall of 1999. By October, 2000, there were a total of twelve employees in the Premier Logistics Services division of Northeast.

"During all the time that the individual defendants worked for Northeast's Premier Logistics Services division, they had no written employment contracts. They never signed noncompete agreements; they had no guarantees as to duration of employment or amount of compensation. They were employees at will.

"Like the parent company Northeast, Premier Logistics Services was in the business of arranging for customers to have freight hauled. Unlike the parent company Northeast, Premier Logistics Services specialized in arranging for delivery of time sensitive advertising materials for retailers. Premier Logistics Services contracted for each individual job with retailers (or brokers for retailers) and similarly contracted with freight haulers for each job. There were no long-term or blanket contracts for any jobs.

"In the short initial year of 1997, Northeast's Premier Logistics Services grossed $300,000 to $400,000. The following year the division grossed $1.5 million. In 1999,

the gross was about $4 million, and the division turned a net profit of $350,000. Over the three years of existence of Premier Logistics Services, Northeast committed about $200,000 to the development of computer software, dubbed 'Drop Ship,' for the operations of Premier Logistics Services.

"The operations of Northeast's Premier Logistics Services division came to an abrupt end at the close of the business day October 18, 2000. All twelve employees of the division resigned simultaneously and went to work for a newly formed company . . . Premier Logistics Services, Inc. (PLS, Inc.). Some or all of the individual defendants are owners of all the stock of PLS, Inc. . .

"Since October 18, 2000, Northeast has ceased all operations in its Premier Logistics Services division. . . . Northeast was unwilling or unable to revitalize its Premier Logistics Services division."

After October 18, 2000, litigation commenced between the parties. On December 18, 2000, the parties entered into a stipulation resolving certain matters arising from the creation of PLS, Inc. This stipulation provided in part that Northeast was entitled to the net profits "from all jobs on which work was begun prior to October 19, 2000, whether the work was finished by [Northeast] or [PLS, Inc.]." The parties attached to the stipulation a list of jobs and, subsequently, payment was made on these jobs to Northeast pursuant to the stipulation.

The parties, having resolved several outstanding concerns under the stipulation, left five unresolved matters to be determined in a court trial. The first matter, involving two docket numbers, was concluded subsequently. *Pilot Air Freight Corp.* v. *Northeast Distribution, Inc.*, Superior Court, judicial district of New Britain, Docket No. CV-01-0511940S, and *AAA Cooper Transportation* v. *Northeast Distribution, Inc.*, Docket No. CV-02-0513169S, were actions against Northeast for freight

charges. In these actions, Northeast brought indemnification claims against PLS, Inc. Prior to the trial, Northeast settled with the two plaintiffs in these cases; during the trial Northeast withdrew its claims against PLS, Inc.[1]

Four other matters await a court ruling. In *Premier Logistics Services, Inc.* v. *Northeast Distribution, Inc.*, Superior Court, judicial district of New Britain, Docket No. CV-02-0518276S, PLS, Inc., seeks reimbursement from Northeast for funds it advanced to shippers that it claims were the responsibility of Northeast. In *Robitaille* v. *Northeast Distribution, Inc.*, Superior Court, judicial district of New Britain, Docket No. CV-02-0518275S, executives at PLS, Inc., make invasion of privacy claims against Northeast, based on mail that it apparently received from Northeast. In *Northeast Distribution, Inc.* v. *Premier Logistics Services, Inc.*, Superior Court, judicial district of New Britain, Docket No. CV-00-0505085S, Northeast claims that it is entitled to the profit of the "outbound job" of Sam's Club performed in November, 2000, and further claims that it is entitled to damages for the appropriation of the name "Premier Logistics Services" by PLS, Inc. The court will discuss each of these claims.

The first issue is the claim by PLS, Inc., for reimbursement in Docket No. CV-02-0518276S. In the stipulation, the parties stated that matters of billing would be resolved through the "cooperation of the parties, which shall be full and unrestrained, and not unreasonably withheld." Judge Winslow stated in her prejudgment remedy opinion that "[t]he parties have stipulated on the record that they will exchange necessary documents, pay outstanding costs and submit to binding

---

[1] These cases are, therefore, not before the court at this time. The court rejects the suggestion of PLS, Inc., that these cases be dismissed with prejudice in lieu of merely accepting the withdrawals. The court permitted Northeast to open its case after it rested to supplement its proof against PLS, Inc., but Northeast instead chose to withdraw the two indemnification claims.

arbitration as to the allocation of the net proceeds from those disputed jobs."[2]

The court, therefore, will not decide whether PLS, Inc., must be reimbursed under a theory of "unjust enrichment," but, rather, because the stipulation requires that costs prior to October 18 be borne by Northeast. The stipulation regarding outstanding costs, signed prior to the prejudgment remedy hearing and then recited on the record before Judge Winslow, is "a contract of the parties acknowledged in open court . . . ." (Internal quotation marks omitted.) *Gillis* v. *Gillis*, 214 Conn. 336, 339, 572 A.2d 323 (1990). " '[It is] the result of a contract and its embodiment in a form which places it and the matters covered by it beyond further controversy.' " *Central Connecticut Teachers Federal Credit Union* v. *Grant*, 27 Conn. App. 435, 437, 606 A.2d 729 (1992), quoting 3 A. Freeman, Judgments (5th Ed. 1925) § 1350, p. 2774.

Reviewing the bills as submitted in evidence by PLS, Inc., the court concludes that the following bills related to the cost of shipping may be appropriately charged against Northeast.

First, the Two Boys Trucking bill totaling $16,409.56. The outstanding invoices to Northeast were dated from August 30 to October 12, 2000.

Second, the LJD Trucking bill totaling $7025. The outstanding invoices to Northeast were dated prior to October 18, 2000.

Third, the J.R. Trucking bill totaling $1240. Northeast was paid for this job as a result of the stipulation and, therefore, should reimburse PLS, Inc., for costs. Together with the J.R. Trucking bill totaling $450. This amount was for a Northeast invoice, paid by PLS, Inc.

---

[2] Apparently, binding arbitration was not instituted. The court will, therefore, resolve this dispute between the parties.

Fourth, the Parker Motor Freight bill totaling $2666.83. The outstanding invoices to Northeast were dated from July 27 to October 11, 2000.

Fifth, the North Coast Transportation bill totaling $900. The outstanding invoices to Northeast were dated from September 30 to October 2, 2000.

Sixth, the NAFTA Trucking bill totaling $2186.79. The job for Northeast was initiated prior to October 18, 2000.

Seventh, the Freight of All Kinds bill totaling $200. The job for Northeast was initiated prior to October 18, 2000.

Eighth, the Red Bird Express bill totaling $225. The job for Northeast was initiated prior to October 18, 2000.

Ninth, the FBT bill totaling $2000. The job was related to an amount paid to Northeast under the stipulation.

Tenth, the GTI Express bill totaling $3670. The job was related to an amount paid to Northeast under the stipulation.

Eleventh, the We R Drayage bill totaling $5471.28. Together with the Fox Transport bill totaling $4366.44. These jobs were related to amounts paid to Northeast under the stipulation.

Twelfth, the English Transport bill totaling $830. This job was related to amounts paid to Northeast under the stipulation.

Thirteenth, and finally, the Cooper & Sons Transportation bill totaling $550. This job for Northeast was initiated prior to October 18, 2000.

In summary, the grand total due to PLS, Inc., from Northeast in Docket No. CV-02-0518276S is $48,189.90.

The second matter is the action by the plaintiffs father and son Robitaille and other executives of PLS, Inc.,

for invasion of privacy in Docket No. CV-02-0518275S. The plaintiffs' proof is that after the litigation ensued, their W-2 forms for 2000 and a portion of a deposition in a related case were sent to certain "subordinate employees" of PLS, Inc. A cover letter stated that "things" were not so bad at Northeast for the nine months preceding the dissolution. This is said to constitute a spite mailing on the part of Northeast.

The plaintiffs presume that the origin of these mailings was with Northeast. No evidence was presented, however, with respect to the source or actual sender of this material. The most the plaintiffs claim is that "someone" at Northeast put the material in the mail. The plaintiffs do not claim any specific damages, stating only in their brief: "[T]his information caused upset and embarrassment."

The court concludes that the plaintiffs have failed to meet their burden of proof and, therefore, the court finds in favor of Northeast in Docket No. CV-02-0518275S. See *Kureczka* v. *Freedom of Information Commission*, 228 Conn. 271, 277, 636 A.2d 777 (1994) (failure to meet burden of proof, invasion of privacy); *Tapia* v. *Sikorsky Aircraft Division*, Superior Court, judicial district of Fairfield, Docket No. CV-95-327761S (May 28, 1998) (*Stodolink, J.*) (failure to set forth elements of tort of invasion of privacy).

The third matter to be resolved stems from Docket No. CV-00-0505085S and arises as follows. Logistics companies sell their services to a distributor of mass commercial mailings by offering techniques for reducing mailing costs. In general, the logistics company arranges for the trucking of catalogs to a central hub where the catalogs are assembled (inbound job) and then for the further shipping of the finished booklets to various destinations (outbound job).

In Docket No. CV-00-0505085S, the parties cannot agree on the disposition of income[3] from a portion of a project known as the "Sam's Club Fall Catalog." The project had both an inbound and outbound component. They agree that the inbound job was commenced before October 18, 2000, and that the receivable was due to Northeast. The outbound job, commenced in early November, 2000, forms the basis of the controversy.[4]

Northeast introduced an invoice showing that the inbound invoice was sent by PLS, Inc., to Ace Marketing Services of Smyrna, Georgia. The invoice indicates that the Sam's Club catalog was transported to the Centennial Bindery in Elk Grove Village, Illinois, on October 11, 2000, as "Ace Job # 98177." Northeast also introduced a series of invoices presented by PLS, Inc., to Ace for the outbound job, bearing the notation "Ace Job # 98177." These invoices are dated November, 2000.

Northeast argues that both the inbound and outbound portions of the Sam's Club project have to be viewed as unitary. The job number was the same on both invoices. On the other hand, PLS, Inc., argues that there was no guarantee that it would receive the outbound job, and the job number was merely assigned by Ace to cover the entire project. PLS, Inc., contends that the outbound job was an entirely new undertaking for it. It would have Northeast establish a legal right to receive payment for the outbound job.

The court, as indicated previously, does not choose to resolve this dispute under the law of unjust enrichment or conversion. Rather, the parties, through their

[3] The plaintiff represents to the court in its brief that the amount in question is $125,000. This figure will be used by the court but should be modified if inaccurate.

[4] Both the stipulation and testimony in court indicate that the only controversy is the outbound job and that this forms the basis of the escrow. The court, therefore, will assume that the $125,000 is solely related to the outbound job.

stipulation, intended to resolve the Sam's Club dispute by placing the amount received by PLS, Inc., for the outbound job in escrow.[5] They thereby created a common fund to which claims may be presented. They represented to Judge Winslow that they were to receive an amount determined fairly due to each party.

Based on the facts presented in the trial of this matter, the court finds that both Northeast and PLS, Inc., have equal claims to the escrow funds. The work on the Sam's Club project began while PLS, Inc., was still a division of Northeast. In prior years, the PLS division secured both parts of the Sam's Club project. On the other hand, PLS, Inc., clearly took the initiative to secure the outbound job after it became an independent corporation. PLS, Inc., knew before the breakup that there was a reasonable likelihood it would be awarded the outbound job.

The leading case in making a division in such a situation states the law to be that the court should make an equal division between the parties. *Century Indemnity Co.* v. *Kofsky*, 115 Conn. 193, 199, 161 A. 101 (1932). In *May* v. *Retarides*, 83 Conn. App. 286, 848 A.2d 1222, cert. denied, 271 Conn. 908, 859 A.2d 562 (2004), the trial court had distributed the proceeds of a policy of insurance between the named insured and two other claimants. The Appellate Court affirmed: "The trial court described the proceeds generated by the insurance policy as a 'common fund.' The court referred to the equitable principle that, if a common fund is

---

[5] PLS, Inc. argues in its brief that the stipulation did not treat the Sam's Club outbound catalog job as similar to the jobs begun before October 19, 2000, mentioned in the first paragraph of the stipulation. The court reads the stipulation, however, to state that Northeast is entitled to the net profits for any job commenced before October 19, and both parties are entitled to those net profits of the Sam's Club outbound catalog job, as resolved "through Alternative Dispute Resolution or litigation." Further, Judge Winslow observed in her prejudgment remedy decision that "[t]here are jobs as to which there may be a dispute as to their pendency on October 18, 2000, in particular the Sam's Outbound [Catalog] job."

insufficient to pay the claims of all the participants in the fund in full, the fund should be distributed pro rata. . . . The plaintiff claims that the trial court's distribution of the insurance proceeds is inequitable in light of the primary role that [the named insured] played in obtaining the insurance policy . . . . The crux of the plaintiff's claim is that . . . the named insured . . . had the first claim on the insurance proceeds that should be honored before any distribution of the funds to the defendants. In other words, he maintains that the [named insured's] . . . claim should be paid in full before any payment to anyone else. . . . [However, in] the absence of more persuasive authority, the trial court had discretion to distribute the proceeds in accordance with the equitable principle of pro rata distribution." Id., 295–96.

Based on this precedent, the court finds in favor of Northeast in the amount of $62,500; that is, half of the amount now being held in escrow by the attorney for PLS, Inc.

The final issue to be resolved in Docket No. CV-00-0505085S is whether any compensation is due to Northeast for the use of the name "Premier Logistics Services" by PLS, Inc. Judge Winslow found that PLS, Inc., took the name, "Premier Logistics Services," when it established the new corporation on October 19, 2000, and that that name had been previously used by a division of Northeast. Also, Judge Winslow found that (1) the use by PLS, Inc., caused confusion to the extent that Northeast "received telephone calls, web site hits and invoices from freight carriers intended for PLS, Inc."; (2) "Robitaille, Jr., deliberately designed the PLS, Inc., letterhead to be similar to the letterhead of Northeast's Premier Logistics Services. He did the same with the load confirmation report form and the bill of lading form"; and (3) "Northeast was unable or unwilling to keep its Premier Logistics Services division operational,

[and] Northeast shut down its business willingly, albeit suddenly and grudgingly, as of October 19, 2000 . . . ." The testimony at trial supports these findings of Judge Winslow.

The court also makes the following findings on this issue. Northeast had had some limited experience with time sensitive material prior to 1997 but had abandoned its attempt to establish a time sensitive division. Prior to 1997, the Robitailles had had several years experience working for a company known as Trans Advo that specialized in time sensitive shipping of advertising material. Over time, Robitaille, Sr., had developed clients throughout the country seeking his advice on lowering costs for time sensitive mailings. Northeast and the Robitailles jointly created the Northeast division in 1997, and Northeast agreed to make an initial investment to support creation of the division. Robitaille, Jr., suggested the name "Premier Logistics Services" to the officers of Northeast when the division was created in 1997.

The court agrees with Judge Winslow that any award of damages against PLS, Inc., for taking the name "Premier Logistics Services" cannot be based on the common-law doctrine of unfair competition. If a plaintiff demonstrates that " 'the effect of appropriation by one corporation of a distinctive portion of the name of another is to cause confusion and uncertainly in the latter's business, injure them pecuniarily and otherwise, and deceive and mislead the public, relief will be afforded.' " *Shop-Rite Durable Supermarket, Inc.* v. *Mott's Shop Rite*, 173 Conn. 261, 265–66, 377 A.2d 312 (1977), quoting *Yale Co-operative Corp.* v. *Rogin*, 133 Conn. 563, 571, 53 A.2d 383 (1947). Northeast agreed at the trial that it could not satisfy this standard.[6]

---

[6] For the same reason, Northeast's claim under the Lanham Act, 15 U.S.C. § 1125 (a), must fail. This act prohibits the unfair trade practice of appropriating the trademark of another ongoing business and thereby causing confusion in the general buying public. See, e.g., *Bristol-Myers Squibb Co.* v.

On the other hand, "in some circumstances, the good will of a business can be appropriated to another's use, and a wrongful appropriation of that property right is actionable." *Board of Trade* v. *Dow Jones & Co.*, 108 Ill. App. 3d 681, 693 n.2, 439 N.E.2d 526 (1982), aff'd, 98 Ill. 2d 109, 456 N.E.2d 84 (1983). In an early case, it was noted in our Supreme Court by one justice that the good will of a business includes its name and that right is protected in the courts. *Rogers & Brother* v. *Rogers*, 53 Conn. 121, 168, 1 A. 807 (1885) (*Loomis, J.,* dissenting). As the court stated in *Steinmetz* v. *Steinmetz*, 7 Conn. Sup. 402, 404 (1939): "Good will is property recognized as such and protected by law. It may have real worth and in this case does possess great value."

Under the facts here, the name "Premier Logistics Services" had value to Northeast, as it was being used in a division of its company. The name also had value to PLS, Inc. The new company recognized that when it began its business, it had an interest in using a name similar to that under which it had been operating. This was especially true under the circumstances of the rapid relocation of the business from Bristol to Newington. The court concludes, therefore, that Northeast is entitled to damages against PLS, Inc., for basking " 'in the reflected popularity' " of the name "Premier Logistics Services, Inc." *Ortho Pharmaceutical Corp.* v. *American Cyanamid Co.*, 361 F. Sup. 1032, 1043 (D. N.J. 1973).

The only question remaining is to determine the value of the name for the purposes of an award of damages. Northeast's expert calculated the value of the name to be $449,000 using both the market and income approaches to value. There are two problems with the final value as claimed by Northeast, however. The first

*McNeil-P.P.C., Inc.*, 973 F.2d 1033 (2d Cir. 1992). Northeast agrees that anyone who contacted it after October 18, 2000, would have been informed that its PLS division was no longer in business.

is that the value of the name, as a type of intangible good will, "must be determined on the basis of the price that a willing buyer would pay in excess of the tangible assets to acquire the [business]." *Eslami* v. *Eslami*, 218 Conn. 801, 814, 591 A.2d 411 (1991). The *Eslami* court sanctioned the use of either the market or income approach in making this determination. Id., 815.

Here, the market approach depends on deriving a figure for the payment of royalties for the use of the name by a subsequent theoretical purchaser of the company. The Northeast expert stated that the royalty rate was 4 percent. The witness for PLS, Inc., a businessman who has had extensive experience in buying companies and paying for intangibles, testified that the market would not support the payment of a royalty. In other words, a purchaser would not find the name significant enough as a generator of income to tender a payment for use of the name. Since no income would be generated through a royalty, the market approach is not appropriate. As stated in Northeast's exhibit concerning the valuation of intangible assets: "In the capitalized royalty method, the subject [name] is valued by reference to the amount of royalty income it could generate if it was licensed, in an arm's-length transaction, to a third party."

In addition, Northeast did not call any witnesses to prove that customers of its division fixed on the name "Premier Logistics Services" when dealing with the company. See *Mattis* v. *Lally*, 138 Conn. 51, 54, 82 A.2d 155 (1951): "Good will in the sense here used means an established business at a given place with the patronage that attaches to the name and the location."

Using the income approach, the evaluator must determine "the amount of economic income the subject [name] generates." Northeast's expert testified that 25 percent of the income to the PLS division of Northeast

was drawn from its name recognition. The evidence is otherwise. The Robitailles, especially Robitaille, Sr., were key in bringing in business to the PLS division. As our Supreme Court emphasized in *Eslami* v. *Eslami*, supra, 218 Conn. 814–15, the value of good will diminishes when the enterprise's success depends on an individual member of the firm. Northeast's expert also selected a capitalization rate of 18 percent that showed a moderate risk. A rate of 25 percent more accurately reflects Northeast's risk. According to *Eslami*, the capitalization rate is the most important factor in the income approach.

The court asked Northeast's expert to take into account instead that the income due to the name was 5 percent and the capitalization rate was 25 percent. He calculated the value to be $76,000.

The second problem with Northeast's figure for the value of the name is that it fails to recognize that the value of the name as a portion of good will must reflect the joint input of both Northeast and the Robitailles to the Northeast division. See *In re Marriage of Suarez*, 148 Ill. App. 3d 849, 867, 499 N.E.2d 642 (1986) (past joint efforts constitute good will). This point was also made by the plaintiff's expert that the value of the name would be affected if Northeast did not hold all the bundle of rights to the name.

As found previously, the Robitailles and Northeast jointly established the Northeast division after the Robitailles left Trans Advo. Northeast's official, Mark Tonan, testified that in late 1997, Northeast was attempting to take on business in the time sensitive field. Tonan interviewed Nadeau and Robitaille, Jr., about creating a division at Northeast. Robitaille, Sr., also served as an advisor to the creation of the division. Robitaille,

Sr., knew of the clients that would need the division's services. Robitaille, Jr., suggested the PLS name to Northeast when the division was first created in October, 1997. The division was run totally autonomously.

No effort was made by Northeast to secure the name as its own until Docket No. CV-00-0505085S was pending for trial. Only on March 8, 2004, was the name reserved with the secretaries of the states of Connecticut and Massachusetts. Thus, both Northeast, because it had invested in the division, and PLS, Inc., because of its prior history with the division, had joint rights in the continued use of the name. See *Deister Concentrator Co.* v. *Deister Machine Co.*, 63 Ind. App. 412, 112 N.E. 906 (1916).

In light of these facts, damages for the appropriation by PLS, Inc., of Northeast's right to use the name "Premier Logistics Services" must be assessed by a division of the asset between the parties. See *Spayd* v. *Turner, Granzow & Hollenkamp*, 19 Ohio St. 3d 55, 61, 482 N.E.2d 1232 (1985) (proportionate share of good will due to partner). The situation may be likened to the taking of goods by one who has a joint claim to them with another party. The remedy in that case is to divide the goods among the respective parties. See *Capron* v. *Porter*, 43 Conn. 383 (1876); R. Brown, Law of Personal Property (3d Ed. 1975) § 6.11, pp. 66–69.

Using the figure of $76,000 as the total value, therefore, the court holds that Northeast is entitled to damages on the use by PLS, Inc., of the name "Premier Logistics Services" in the amount of $38,000.

To summarize, the court enters the following judgment in each case.[7] In Docket No. CV-02-0518276S, judgment in favor of the plaintiff, PLS, Inc., in the amount

---

[7] The action against Allen and Nadeau in Docket No. CV-00-0505085S is dismissed as Northeast has failed to trace any wrongful conduct to these two defendants.

of $48,189.90. In Docket No. CV-02-0518275S, judgment in favor of the defendant, Northeast. In Docket No. CV-00-0505085S, judgment in favor of the plaintiff, Northeast, in the amount of $100,500.