*In re* MARRIAGE OF HARRY RUBINSTEIN, Petitioner and Counterrespondent-Appellee, and HELEN RUBINSTEIN, Respondent and Counterpetitioner-Appellant.

Second District No. 84—0770

Opinion filed July 10, 1986.

Keith E. Roberts, Sr., and Robert R. Verchota, both of Donovan & Roberts, P.C., of Wheaton, for appellant.

Erlich, Bundesen & Zavett, Errol Zavett, and Henry Krasnow and Barbara N. Fox, both of Mandel, Lipton & Stevenson, all of Chicago, for appellee.

JUSTICE STROUSE delivered the opinion of the court:

This is an appeal by the wife of the trial court's distribution of property and determination of support as set forth in a supplemental judgment for dissolution of marriage.

Petitioner, Harry Rubinstein, and respondent, Helen Rubinstein, were married on June 28, 1970, at the age of 21. Two children were born of the marriage: Jason on June 1, 1978, and Dana on April 2, 1980. Harry filed a petition for dissolution of marriage on January 3, 1983, and Helen filed a counterpetition for dissolution on January 18, 1984. On January 24, 1984, the trial court granted the judgment for dissolution of marriage, reserving for future determination the issues of custody, support and maintenance. No question is raised on the dissolution of the marriage.

At the time of the marriage, both Harry and Helen had recently graduated from college with bachelor's degrees. Helen was employed as a high school English teacher with the Chicago public school system, and Harry was about to begin his first year of medical school. It is uncontroverted that the parties had an understanding that she would work to support the family during the years of Harry's medical training and then she would have the opportunity to further her edu-

cation and career.

Helen taught for 10½ years, during which time Harry pursued his medical education and training for nine years, including four years of medical school, three years of internship and residency and two years of a fellowship. Helen's earnings as a teacher were almost the sole family income in the early years. Helen attended night school and obtained a master's degree in special education, managed the household, and took care of the family. She gave up outside employment after their second child's birth in 1980.

Helen is currently pursuing an MBA degree, which she started in September 1982. She hopes to complete that degree and obtain employment in the business sector. Helen has no desire to return to teaching.

Helen resides in the marital residence in Naperville with the two minor children. She calculated the average cost of living for herself and the children on a monthly basis for the period of July 1981 through March 1984. That average monthly expense, including an allowance for an assumed 21% tax rate, equals $5,493.69. Without an allowance for taxes, the monthly average equals $4,540.24.

Harry is a medical doctor specializing in internal medicine, who commenced his medical practice after completing his fellowship in July 1979. He maintains offices at two locations in Aurora; one office is operated under the name Aurora Associates in Internal Medicine, Limited (AAIM), and the other under the name East Fox Valley Associates. Harry receives his salary through AAIM, a professional medical corporation, of which Harry is a one-third stockholder and owner. At the time of trial he testified that his gross monthly income from AAIM was $7,000 and his net monthly income was $5,000. We note, however, the record demonstrates that Harry's proposed 1983 tax return reflects a gross monthly income of $8,371, and a net monthly income of $6,884. His 1982 return showed a gross monthly income of $10,313. In addition, AAIM has both a profit-sharing and pension plan. As of April 30, 1983, Harry's profit-sharing account had a value of $49,879.33; his pension plan had a value of $11,710. The sum of $2,600 per month is paid for Harry's benefit on the pension plan by AAIM.

In addition to Harry's salary, pension and profit-sharing benefits, Harry had made cash withdrawals from AAIM totalling $10,091 in 1983. Harry testified that he owed AAIM the sum of $18,192.93, but admitted that that sum includes $7,819 net income and withholding of $6,181. It also includes a $2,000 loan to Harry's sister, who is not associated with the corporation, which is shown on the books as a loan

to Harry. Harry also has IRA accounts totalling approximately $13,500.

The parties had an account at Thomson-McKinnon which had balances as high as $21,500 in it prior to trial. Harry admitted having withdrawn that money, but claimed $17,000 was applied to the Bank of Ravenswood mortgage on the River Forest home being sold on contract. The balance not specifically accounted for, he claimed, was used to meet his personal financial obligations.

Harry has resided in a rental apartment in Naperville since he left the marital residence in August 1982. He testified that his monthly cost of living is $2,809. This would leave his monthly net after taxes and living expense at $4,075.

The evidence presented at trial included the testimony of Marlys Moore, the business manager of AAIM, regarding Harry's financial dealings and relationship with that corporation, and Hugh B. McCulloch, Helen's expert regarding the value of Harry's medical practice. In McCulloch's opinion, this practice, including Harry's interest in the pension and profit-sharing accounts, was worth $430,000 as of March 31, 1984.

The trial concluded on April 6, 1984. Written closing arguments were presented on behalf of each of the parties. On April 13, 1984, the trial court announced its findings and decision. After various continuances, the supplemental judgment was entered as proposed by Harry's attorney on July 19, 1984.

The supplemental judgment entered by the trial court ordered Harry to pay unallocated support for Helen and the two children in the amount of $2,800 per month. We note that this amount was taxable to Helen and deductible by Harry. We further note that the court ordered Helen to be responsible for all mortgage payments of $1,752 per month plus real estate taxes of $221 per month, insurance and normal maintenance expenses on the home pending the court ordered sale.

On August 17, 1984, Helen appealed from the supplemental judgment for dissolution of marriage. On August 22, 1984, Helen filed a separate notice of appeal from the trial court's August 21 order that the marital residence be placed on the market with a real estate broker within three days. On August 23, 1984, Harry filed a notice of cross-appeal.

■ Helen first contends that the trial court abused its discretion in failing to determine the value of Harry's medical practice before the property was divided between the parties. This is based on an early statement of the trial judge that he would make no finding of

value as to the corporation. However, since his supplemental judgment for dissolution specifically valued Harry's one-third stock ownership in AAIM at $14,867, Helen's argument that no determination of value was made is meritless and not supported by the record.

■ Helen next argues that the trial court improperly valued Harry's stock in AAIM. There was substantial evidence concerning the value of Harry's stock in AAIM, including AAIM's financial statements, an employment agreement between Harry and AAIM, and the testimony of four witnesses: Hugh B. McCulloch, the owner of Family Business Advisory Services, Helen's expert witness; Marvin Fox, an accountant for AAIM; Marlys Moore, AAIM's bookkeeper; and Harry himself.

McCulloch valued Harry's share of AAIM at $332,490 on March 31, 1984. His valuation included consideration of book value, goodwill, accounts receivable, and unbilled services. His approach also took into account Harry's income as disclosed by the financial statement of AAIM for the fiscal year ending April 30, 1984. While Harry testified at length about his income and the nature of his practice, he presented no testimony as to the value of the corporation other than the financial statements of AAIM.

We first note that the trial court should value the marital property of the parties as of the date of the judgment dissolving the marriage of the parties. (*In re Marriage of Brooks* (1985), 138 Ill. App. 3d 252, 260; *In re Marriage of Frazier* (1984), 125 Ill. App. 3d 473, 476; *In re Marriage of Rossi* (1983), 113 Ill. App. 3d 55.) The supplemental judgment for dissolution entered by the trial court valued Harry's stock in the medical practice at $14,867, its book value on April 30, 1983, nine months before the dissolution. Substantial evidence showed an increase in book value in the nine months after April 30, 1983, although no book entry was made. The property should be valued as of January 24, 1984, and where, as here, there are adequate financial records to permit a more exact valuation, the trial judge should have used the evidence to make a valuation more nearly in accord with the corporation's value on that date.

Secondly, we note that the trial judge here gave no consideration to the accounts receivable and completed but unbilled services although it is not substantially disputed that in this State accounts receivable and unbilled accounts are assets and should be properly considered in the valuation of a business. (*In re Marriage of Leon* (1980), 80 Ill. App. 3d 383, 386.) Where, as here, Harry has incorporated his medical practice, these corporate assets must be taken into consideration in determining the value of his stock. See generally Davis, *Valu-*

*ation of Professional Practices in Dissolution Cases,* 74 Ill. B. J. 14 (1985).

Finally, another factor missing from the value of the corporate stock was corporate goodwill. While Harry's expert testified that the practice had no or negligible goodwill, we note that in the instant case the partners had paid at least $5,000 for it. The consideration of the corporate goodwill of a marital asset has been discussed by several different Illinois courts. Our courts first considered this question when the Second District of the Illinois Appellate Court reviewed the valuation of an insurance proprietorship. (*In re Marriage of Leon* (1980), 80 Ill. App. 3d 383.) We adopted a view of valuation from a California case which stated that consideration must be given to " '(a) fixed assets, which we deem to include cash, furniture, equipment, supplies and law library; (b) other assets, including properly aged accounts receivable, costs advanced with due regard for their collectability; work in progress partially completed but not billed as a receivable, and work completed but not billed; (c) goodwill of the practitioner in his law business as a going concern; and (d) liabilities of the practitioner related to his business.' " (80 Ill. App. 3d 383, 386, quoting *In re Marriage of Lopez* (1974), 38 Cal. App. 3d 93, 110, 113 Cal Rptr. 58, 69.) Our court noted that "the weight of authority in other jurisdictions is that the interest of a spouse in a law or medical partnership including the 'goodwill' of such business has been held to be marital property." *In re Marriage of Leon* (1980), 80 Ill. App. 3d 383, 386.

The Appellate Court for the Fifth District considered this question in *In re Marriage of White* (1981), 98 Ill. App. 3d 380, and approved of the *Leon* court's adoption of the *Lopez* analysis in considering the valuation of a professional corporation. Specifically addressing the issue of placing a value on the corporation's goodwill, the court stated: "We think the better rule to be that good will should be a factor to consider when appraising the value of a professional corporation." (98 Ill. App. 3d 380, 384.) The court explained that "despite the intangible quality of good will in a professional practice, it is of value to the practicing spouse both during and after the marriage and its value is manifested in the amount of business and consequently, in the income which the spouse generates. [Citation.]" 98 Ill. App. 3d 380, 384; see also *In re Marriage of Wilson* (1982), 110 Ill. App. 3d 809, 813-15 (fifth district remanded cause for additional evidence of value of respondent's two-man lumbering partnership, noting specifically "the existence and value of good will as an asset of the partnership should also be considered").

Two years later the Appellate Court for the First District addressed the same issue and rejected the analysis of the *White* court. The court reasoned that if it were to consider goodwill as a factor in valuing a professional corporation, it would be giving double consideration to the professional spouse's ability to generate income. (*In re Marriage of Wilder* (1983), 122 Ill. App. 3d 338, 347.) However, when the same court remanded the case of *In re Marriage of Davis* (1985), 131 Ill. App. 3d 1065, for *inter alia*, failing to properly value respondent's law practice, it pointed to *In re Marriage of Lopez* for factors to consider in valuing the law practice—including the "goodwill of the practitioner in his business as a going concern." (131 Ill. App. 3d 1065, 1069.) The question of the place of goodwill in valuing professional corporations has further been the subject of at least two recent articles. See Davis, *Valuation of Professional Practices in Dissolution Cases*, 74 Ill. B. J. 14 (1985) (discussing with disapproval the *Wilder* rejection of considering the goodwill of a professional corporation when dividing the marital assets); Note, *The Illinois Appellate Court Grapples with Good Will in a Professional Practice—Is It Property or Just Another Factor?*, 1985 S. Ill. U.L.J. 285 (discussing the same issue with approval).

We consider the better view for a fair and just disposition of marital property requires considering goodwill in valuing professional corporations. The Illinois Marriage and Dissolution of Marriage Act requires a trial court to divide the marital property considering, *inter alia*, "the value of the property set apart to each spouse." (Ill. Rev. Stat. 1983, ch. 40, par. 503(d)(2).) To ignore the intangible asset of goodwill could result in undervaluing the practice and the corporation's stock, and thereby lead to an inequitable distribution of the property. For the foregoing reasons, we find that the trial judge abused his discretion in (1) valuing the practice nine months prior to the date of dissolution; (2) failing to consider any evidence offered valuing the corporate assets of accounts receivable and unbilled but completed services; and (3) failing to consider any evidence offered toward the value of the corporation's goodwill.

 ■ Helen next argues that the values attributed to Harry's pension and profit-sharing plans were against the manifest weight of the evidence. We agree. Helen's expert testified at trial that Harry's pension and profit-sharing accounts should be valued at $97,510. Harry offered the testimony of Marvin Fox, pursuant to a stipulation. Fox would testify that he is a certified public accountant who does the books and records for Harry's professional corporation. He would value the profit-sharing plan and pension plan at zero since Harry was

not vested in either plan. He would admit, however, that Harry's interest in the pension plan as of April 30, 1983, was $11,710 and his interest in the profit sharing was $49,880. While there was disputed testimony as to the funding of the pension and profit-sharing plans after that date, Fox's stipulation did admit that $12,613 had been contributed to Harry's pension plan since April 30, 1983. The trial judge valued Harry's interest in the pension and profit-sharing plans at $11,710 and $49,889, respectively. This was their value on April 30, 1983.

The courts of Illinois have established that pension rights whether matured, vested, contributory or noncontributory, are property under section 503 of the Act (Ill. Rev. Stat. 1983, ch. 40, par. 503; *In re Marriage of Davis* (1985), 131 Ill. App. 3d 1065, 1070; *In re Marriage of Hobbs* (1982), 110 Ill. App. 3d 451), and that this value should be determined as of the time of the divorce (*In re Marriage of Hunt* (1979), 78 Ill. App. 3d 653; 663; see also *In re Marriage of Wisniewski* (1982), 107 Ill. App. 3d 711, 715-18). Here, the trial judge valued these funds as of April 30, 1983, nine months prior to the date of the dissolution of the marriage. This decision was made despite considerable evidence of AAIM's funding of the plans between April 30, 1983, and the date of dissolution. In these respects the trial judge's valuation of the plans is against the manifest weight of the evidence. This error will require a rehearing and reevaluation of the pension and profit-sharing plans.

■ Here, since a rehearing to redetermine the value of the property and Harry's practice is necessary, the division of property, the unallocated support, division of marital assets and sale of the marital home must all be reconsidered. (*In re Marriage of Rapacz* (1985), 135 Ill. App. 3d 1045, 1051; *In re Marriage of Rosen* (1984), 126 Ill. App. 3d 766, 778.) This being the case, we need not address other contentions made by the parties.

■ We would, however, express our concern with the trial court's award of maintenance for Helen and the two children. The evidence is uncontested that during the nine years Harry was achieving his medical education, Helen was the primary breadwinner for the family. During their first five years of marriage, Harry's total income averaged less than $2,000 per year. It is uncontroverted that the parties had agreed that she would support Harry and the family while he completed his nine years of education and he would then take care of her while she completed her's. In a definitive opinion, *In re Marriage of Weinstein* (1984), 128 Ill. App. 3d 234, the court determined that a degree or college education was not marital property in Illinois. How-

ever, the contributing spouse must receive some form of compensation for the financial effort and support provided to the student spouse in the expectation that the marital unit will prosper in the future particularly where, as here, Harry filed the suit for divorce so soon after Helen completed her part of the bargain. (128 Ill. App. 3d 234, 241.) There are three principal methods of affording compensation: (1) distribution of marital assets; (2) some form of maintenance or alimony; or (3) an equitable monetary award based on some equitable principle. (128 Ill. App. 3d 234, 242.) Such consideration was not articulated in this case.

In determining the proper amount of maintenance to be awarded, the trial court should consider the factors set out in section 504(b) of the Act. These factors are:

"(1) the financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, ***;

(2) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) the standard of living established during the marriage;

(4) the duration of the marriage;

(5) the age and the physical and emotional condition of both parties;

(6) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance; and

(7) the tax consequences of the property division upon the respective economic circumstances of the parties." Ill. Rev. Stat. 1983, ch. 40, par. 504(b).

It is clear that Helen's background, training and education (even if completed as contemplated by the parties) will never place her in the high-income position for which she worked and which she enjoyed while married to Harry. It is apparent from the monthly and annual contributions made to the pension and profit-sharing plans by Harry that Helen will not have a comparable opportunity to acquire assets and property by way of savings or through capital investment.

The unallocated support gave Helen $2,800 per month from which she was required to pay a monthly mortgage of $1,752, plus taxes of $221 per month, insurance, income tax on the $2,800, and living expenses for herself and two children. Harry claimed $2,809 for his attested living expenses. This left him a surplus of more than $4,000 per month not including his fringe benefits. It is also apparent that

Harry, on at least one occasion, used corporate funds (travelers checks in the amount of $3,000) for his living expenses. This certainly should be considered in determining the disposition of property. There is no question but that Illinois courts give consideration to a more permanent award of maintenance to wives who have undertaken to have children, raise and support the family, and who have lost or been substantially impaired in maintaining their skills for continued employment during the years when the husband was getting his education and becoming established. (See *In re Marriage of Carney* (1984), 122 Ill. App. 3d 705, 715; *In re Marriage of Weinberg* (1984), 125 Ill. App. 3d 904; *In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452.) In next considering the maintenance for Helen and the children, consideration of whether permanent maintenance should be granted would be appropriate.

Reversed and remanded.

SCHNAKE and LINDBERG, JJ., concur.