*In re* MARRIAGE OF CHARLES R. PHILLIPS, Petitioner-Appellee, and PERMELIA ANN PHILLIPS, Respondent-Appellant.

Second District   No. 2—91—0695

Opinion filed May 22, 1992.—Rehearing denied July 8, 1992.

810

Scott Courtin, of Truemper, Hollingsworth & Wojtecki, of Aurora, and Wilson Burnell, of Oswego, for appellant.

No brief filed for appellee.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

Respondent, Permelia Ann Phillips (Ann), appeals after the trial court entered a judgment dissolving her marriage with petitioner, Charles R. Phillips. The judgment designated the distribution of marital and nonmarital property between the parties. Ann appeals, contending that a new trial should be granted to determine the proper value of certain assets, that the distribution of marital assets was grossly unfair, and that she should be reimbursed for the value of certain nonmarital property that was deemed marital property. We reverse in part and remand.

The parties were married on April 18, 1981, and resided in Aurora, Illinois. Before the marriage, Charles was a barber in business with his half-brother. Ann was in management with AT&T. The couple lived in Charles' apartment for a short time after their marriage. They later moved to 1131 E. New York Street in Aurora, a building that was purchased by the couple for a "Unisex Hair Styling" shop before their marriage. They lived in an efficiency apartment in the building for three months.

The property at 1131 E. New York was purchased for $25,000. Charles paid the $2,500 earnest money out of his funds. Ann contributed $4,000 toward the purchase of the building. A mortgage for $18,500 was obtained with the Aurora National Bank (Aurora National). The couple worked together to remodel and convert the building into a hair styling shop. The shop is named "Phillips Hair Studio" and is primarily operated by a business manager. The value of the property was stipulated to be $68,500.

After living at 1131 E. New York for three months, the couple moved to 830 Galena in Aurora. The building was owned by Ann prior to the marriage. Charles testified that he made improvements to the building before they moved into it. The couple lived at 830 Galena for a year and a half. After moving from the property, Ann sold it for $39,000, receiving net proceeds of $32,870.18. She deposited this money into account No. 251605 at Aurora Federal Savings (Aurora Federal), a joint account in the names of Ann and her mother, Lucille Marie Davis.

In 1983, the couple purchased a house at 575 Apache Drive in Batavia for $77,000. Charles and Ann each contributed $8,000 toward the down payment, and the remaining balance was financed with a mortgage. Charles made certain repairs to the house, including plumbing, trim, flooring and painting. In July 1986, the house was refinanced through Aurora Federal for $55,000. Charles has continued to live at 575 Apache since the purchase. The value of the property was stipulated to be $110,500 at trial.

In June 1986, AT&T transferred Ann to Freehold, New Jersey. Ann purchased 20-H Manchester in Freehold for $60,000, to live in while in New Jersey. Ann financed part of the purchase with a mortgage that had an unpaid balance of approximately $50,000 in June 1989. Ann was transferred back to Aurora in October 1987. By that time, petitions had been filed to dissolve the couple's marriage.

During the couple's marriage, the finances of both parties were kept relatively separate. Each party filed separate income tax returns. Ann's salary with AT&T was approximately $47,000 a year plus "A.P.A. team awards." Ann has a savings plan with AT&T which, as of June 1, 1989, had a balance of $153,072.34. The premarital contribution and accumulation in the AT&T savings plan had a value of $58,782.97 as of June 1989. Ann also participates in AT&T's stock ownership plan. A January 1982 statement from AT&T showed that Ann owned 13.985 shares of stock through 1980, and at the time of trial in June 1989, she owned 137.682 shares. The value of the stock was stipulated as the closing price on June 12, 1989. Ann also has a pension plan with AT&T. The value of the portion acquired during the marriage was stipulated to be $10,191.

Ann owned a number of other accounts containing savings and stock. She has a bank account with Old Second National Bank of Aurora, account No. 28322, for daily financial transactions. The balance on June 12, 1989, was approximately $800. Ann opened an account with Aurora Federal, No. 251605, in January 1983. Ann deposited portions of her AT&T salary into this account. The proceeds from the

sale of her property at 830 Galena were also deposited into this account. From this account, Ann wrote checks to Merrill Lynch for deposit into her stock account.

Ann has three separate accounts with Merrill Lynch. Account No. 62621432 is a stock transfer account which Ann claims had a balance of $20,000 when the couple married. The total value of shares on June 12, 1989, was $60,092.13. Account No. 62621707 is a Canadian Maple Leaf Gold Coin account containing 10 coins. The value of the coins on April 22, 1989, was approximately $3,889. The third account with Merrill Lynch, No. 62685255, was opened to roll over her AT&T IRA accounts. The balance of the account was determined to be $19,935.79, as of June 1989.

Finally, Ann purchased shares in Putnam Health Sciences Trust on May 21, 1982, which were held with her other Merrill Lynch accounts. On June 20, 1989, it was stipulated that the value of the account was $12,500.

As previously stated, Charles was a barber before his marriage to Ann. He also was in the business of purchasing distressed real estate. Charles and his brother purchased 323 Flagg Street, Aurora, prior to his marriage to Ann. The property was purchased in his brother's name. The value of 323 Flagg was stipulated at trial to be $28,000.

Other properties which were purchased during the marriage were put into an Illinois land trust, trust No. 53270, with Aurora National as trustee. The beneficial interest in the trust was assigned to Aurora National to secure a $70,000 line of credit. The trial judge assigned values to the properties in trust by subtracting the mortgage balance from either the stipulated values assigned to them at trial on June 12, 1989, or the purchase price. The properties included in the land trust were: 120 N. State Street and 124 N. State Street, Aurora, valued together by the trial court at $18,522.76; 1018-1020 Kane Street, Aurora, valued at $15,000; 1128 New York, Aurora, valued at $55,000; 202-204 Schiller Ave., Aurora, valued at $30,349.22; and 737 Kane, Aurora, a vacant lot that was improved with a house from 910 Kane, Aurora, valued at $5,000.

Charles had another property in the trust, 918 Kane, Aurora, which was sold before the trial court assigned values to the properties in trust. The property was sold for $31,000. Also, in January 1989, 1128 New York was sold for $55,000. Charles had also purchased a house at 915 Fenton for approximately $2,300, which was moved to 1020 Kane, Aurora. Charles sold 202-204 Schiller for $77,000. Finally, 737 Kane was appraised after the hearings, with the house from 910 Kane on the lot, at approximately $55,000.

Hearings were held on all property and maintenance issues beginning on June 5, 1989. On June 12, the parties stipulated to the values of many of the properties previously discussed. After the hearings concluded in August 1989, the court requested briefs from both parties detailing the proposed distribution of marital and nonmarital assets.

The filing of the trial briefs was not complete until July 1990. In the interim, Charles sold 202-204 Schiller in violation of the court's September 15, 1989, order restraining him from selling real estate. After a hearing on a rule to show cause, the court ordered Charles to pay one-half of the $11,756.02 net proceeds from the sale of the property to Ann. Ann claims that she never received the proceeds.

On March 21, 1991, the trial court issued a letter opinion detailing the court's decision on the distribution of property between the parties. The values given to the property were those stipulated to or determined in the hearings in June and August 1989. The court distributed assets in the following fashion:

"*To Charles Phillips*

Non-Marital Property

1. Barber and beauty business known as Phillips Hair Studio along with inventory and bank accounts value— $35,000
2. 323 Flag Street, Aurora, Illinois 14,000

Marital Assets

1. 1131 East New York Street, Aurora, Illinois 68,500
2. 575 Apache Drive, Batavia, Illinois 110,500
3. Beneficial interest in Aurora National Bank Trust #52370 including properties at 120/124 State Street; 1128 East New York Street; 202-204 Schiller, Aurora, Illinois; 1018 Kane Street, Aurora[,] Illinois; 737 Kane Street, Aurora, Illinois; less individual mortgages on said premises and Aurora National Bank line of credit in the approximate amount of $70,000 which said mortgages and line of credit Charles Phillips shall assume and be solely obligated to pay and shall indemnify and hold Wife harmless therefrom 53,871.98
4. Charles Phillips IRA Account 4,300

| | |
|---|---|
| 5. 1986 Nissan automobile | 9,000 |
| 6. Aurora Federal Savings & Loan Assoc. Account #208311-1 | 3,404.06 |
| 7. Aurora Federal Savings & Loan Assoc. Account #205359-3 | 1,177.34 |
| 8. 1986 Van | 500 |
| 9. Used barber and beauty chairs | 2,000 |
| 10. One-half A T &T ESOP [Employee Stock Ownership Plan] | X |

*To Permelia Ann Phillips*

Non-Marital Property

| | |
|---|---|
| 1. Merrill Lynch Account #62621707 | $ 3,889 |
| 2. AT&T Pension Plan non-marital portion | 12,188 |

Marital Property

| | |
|---|---|
| 1. Merrill Lynch Account #6262134 | 60,092 |
| 2. AT&T Savings Plan for Salaried Employees | 155,072.34* |
| 3. AT&T Pension Plan marital portion | 10,191 |
| 4. Merrill Lynch Account #626-85255 | 19,935.79 |
| 5. Aurora Federal Savings & Loan Assoc. Account #001-09-251605 | 6,018.48 |
| 6. Putnam Health Services Account | 12,500 |
| 7. 20H Manchester, Freehold, New Jersey | 20,000 |
| 8. Old Second National Bank Account #28322 | 800 |
| 9. 1983 Buick automobile | 1,500 |
| 10. One-half AT&T Employee Stock Ownership Plan | X" |

* This figure should be 153,072.34

The trial court also stated that each party would be responsible for the debt, taxes and expenses on each property awarded to him or her. Ann was given the right to repurchase the one-half interest in the AT&T stock ownership plan awarded to Charles. No maintenance or attorney fees were awarded.

The judgment for dissolution of marriage was filed on April 19, 1991, in accordance with the trial judge's previous letter opinion. Ann filed a post-trial motion on May 14, 1991, claiming numerous errors by the trial court. Her main contention was that the court erred in using the June 1989 stipulated values of certain property to determine the distribution of property in April 1991. Ann's post-trial motion was denied on May 24, 1991. Thereafter, she filed a timely notice of appeal.

Ann contends that a new trial on the issue of property valuation should be granted because the trial court erred in using stipulated values from June 1989 instead of values determined at the time of the judgment in April 1991. Ann also contends that the distribution of marital assets was grossly unfair because the trial court failed to properly consider Ann's contributions in acquiring and preserving marital property. Finally, Ann contends that she should be reimbursed for portions of marital property that she owned prior to the marriage, citing section 503(c)(2) of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1989, ch. 40, par. 503(c)(2)).

We note that the petitioner, Charles, has not filed a brief in this cause. We will analyze the appeal in accordance with the principles discussed in *First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, 133.

We find that Ann's third contention squarely addresses the distribution problems in this case, and we choose to address it first. Ann contends that the trial court erred by failing to reimburse her for the value of her nonmarital property that was found transmuted into marital property. In essence, we are asked to interpret section 503(c)(2) of the Act, which states:

"(2) When one estate of property makes a contribution to another estate of property, or when a spouse contributes personal effort to non-marital property, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation; provided, that no such reimbursement shall be made with respect to a contribution which is not retraceable by clear and convincing evidence, or was a gift, or, in the case of a contribution of personal effort of a spouse to nonmarital property, unless the effort is significant and results in substantial appreciation of the non-marital property. Personal effort of a spouse shall be deemed a contribution by the marital estate. The court may provide for reimbursement out of the marital property to be divided or by imposing a lien against the nonmarital property which received the contribution." Ill. Rev. Stat. 1989, ch. 40, par. 503(c)(2).

Ann claims that she should receive reimbursement for $58,339.61, the amount that was in her AT&T savings plan before she was married. She also claims that she should be reimbursed for the premarital value of her Merrill Lynch stock account, No. 62621432, which was approximately $20,000. Ann claims that the net proceeds from the sale of 830 Galena, $32,870.19, should be subject to reimbursement because it was nonmarital property. Finally, Ann suggests that the trial court was in-

consistent in awarding nonmarital property because Charles received 323 Flagg as nonmarital property when marital assets were used to improve it.

Ann has focused on the right to reimbursement under section 503(c)(2). To fully understand the interpretation of section 503(c)(2) of the Act, we must also analyze section 503(c)(1), which states:

> "(1) When marital and non-marital property are commingled by contributing one estate of property into another resulting in a loss of identity of the contributed property, the classification of the contributed property is transmuted to the estate receiving the contribution, subject to the provisions of paragraph (2) of this subsection; provided that if marital and non-marital property are commingled into newly acquired property resulting in a loss of identity of the contributing estates, the commingled property shall be deemed transmuted to marital property, subject to the provisions of paragraph (2) of this subsection." Ill. Rev. Stat. 1989, ch. 40, par. 503(c)(1).

Before the court may dispose of property upon dissolution of marriage, it must be classified as either marital or nonmarital. (*In re Marriage of Durante* (1990), 201 Ill. App. 3d 376, 381.) The classification will not be disturbed unless contrary to the manifest weight of the evidence. (*In re Marriage of Landfield* (1991), 209 Ill. App. 3d 678, 689.) After classification, the court assigns each spouse's nonmarital property to that spouse and divides the marital property between the parties in just proportions. (Ill. Rev. Stat. 1989, ch. 40, par. 503(d).) Section 503(b) provides that all property acquired after the marriage is presumed to be marital property regardless of how title is held and the presumption is rebutted by showing that property was acquired by a method listed in section 503(a) of the Act. (Ill. Rev. Stat. 1989, ch. 40, par. 503(b).) Clear and convincing evidence is needed to rebut the presumption that property acquired after the marriage is marital property. *Landfield*, 209 Ill. App. 3d at 692.

When applying section 503(c)(1) to Ann's AT&T savings plan, we find that the trial judge erred in designating this asset as marital property. The trial judge followed Charles' argument that the savings plan was marital because marital contributions, those contributions made to the plan after marriage, were commingled with nonmarital contributions to create a marital asset. In fact, section 503(c)(1) states that when marital and nonmarital assets are commingled resulting in the loss of the identity of the *contributed* property, the resulting asset retains the classification of the property *receiving* the contribution, subject to

reimbursement to the contributing estate. Ill. Rev. Stat. 1989, ch. 40, par. 503(c)(1).

Here, the savings plan would retain its original classification as Ann's nonmarital property. The contributions made to the savings plan during the marriage were marital property because remuneration to a spouse, in whatever form, during the marriage is considered marital property. (See *In re Marriage of Wisniewski* (1982), 107 Ill. App. 3d 711, 715 (part of husband's pension attributable to the married years is to be considered as marital property).) The savings plan is funded through salary contributions by the employee and matching funds of 66 cents for every dollar for the first 6% of the employee's salary by AT&T. The cash contributions into the savings plan during the marriage lost their identity and became part of the nonmarital savings plan. Thus, the savings plan should have been classified as nonmarital because the savings plan was the property *receiving* the contributions.

Section 503(c)(2) allows for reimbursement to the contributing estate, unless it was a gift from that estate or is not traceable by clear and convincing evidence. (Ill. Rev. Stat. 1989, ch. 40, par. 503(c)(2).) Here, there was no evidence presented to show that the contributions made to the savings plan were meant to be a gift from the marital estate to Ann's nonmarital estate. Ann's contention that marital problems occurring six months after the marriage began demonstrate that a gift was intended is insufficient evidence to prove a gift of marital property to the nonmarital estate. (See generally Feldman & Fleck, *Taming Transmutation: A Guide to Illinois' New Rules on Property Classification & Division upon Dissolution of Marriage*, 72 Ill. B.J. 336, 340 (1984) (when marital property contributed to nonmarital estate, presumption of marital property overcomes common-law presumption of gift).) Also, the marital contributions are traceable by clear and convincing evidence. Ann presented an expert witness, James Casey, who supplied detailed evidence of the contributions made to the savings plan before and after the marriage.

The trial court erred in classifying the AT&T savings plan as marital property. On remand, the trial court should include the savings plan in Ann's nonmarital estate. The marital estate should be reimbursed for the contributions made to the savings plan after the date of marriage. James Casey presented a document prepared by AT&T, Ann's exhibit No. 29, that detailed the marital contribution to the savings plan. All accumulations in the plan, even those resulting from contributions of marital property, are nonmarital property, subject to reimbursement. (Ill. Rev. Stat. 1989, ch. 40, par. 503(a)(7).) The marital contribution, subject to reimbursement, is $94,280.37, based on Ann's exhibit. We recognize

that the exhibit deems the premarital portion to be prior to January 1, 1981, when in reality the parties were married in April 1981. However, neither party objected to the use of this chart to distinguish premarital and marital contributions and accumulations, and we find that the chart makes the distinction as well as can be done.

■ The same analysis would apply to the distribution of Ann's shares of stock owned through the AT&T employee stock ownership plan. Ann's exhibit No. 15A detailed the number of shares allocated to Ann before the marriage. The number of shares owned by Ann through 1980, as stated on the statement of account as of January 2, 1982, was 13.958 shares. In June 1989, Ann testified that she owned 137.682 shares of stock.

Under section 503(c)(1) of the Act, the stock ownership plan is a nonmarital asset that increased after marriage through contributions based on Ann's salary, a marital asset. As such, the entire stock plan, all 137.682 shares, should be classified as nonmarital property subject to reimbursement to the marital estate for contributions made to the plan during the marriage. Ann's exhibit No. 14 distinguishes the accumulation of stock prior to 1981 and the dividend accumulations on that stock versus the accumulation of stock and dividends after the marriage. Based on that document, the marital estate is entitled to a reimbursement of 68.574 shares of AT&T stock valued, as per the trial judge's determination, as of the date of the close of business on the New York Stock Exchange as reported in the Chicago Tribune for June 12, 1989.

The classification and distribution of the AT&T savings plan and the employee stock ownership plan is analogous to the classification and distribution of stock owned by the husband in *In re Marriage of Landfield* (1991), 209 Ill. App. 3d 678. There, the husband owned 1,588½ shares of stock in the Landfield Company. The husband acquired 223 shares prior to the marriage, inherited 511½ shares from his father's estate after marriage, and acquired 854 shares during the marriage. (*Landfield*, 209 Ill. App. 3d at 690-91.) The reviewing court found that the trial court properly classified the 854 shares as marital property because the husband failed to rebut the presumption that the property acquired after the marriage was marital property. *Landfield*, 209 Ill. App. 3d at 693.

Here, the classifications of the savings plan and stock ownership plan are similar. Ann owned portions of each before marriage. These portions are designated as nonmarital property. The portions acquired during the marriage are presumed to be marital property. (Ill. Rev. Stat. 1989, ch. 40, par. 503(b).) Ann failed to rebut this presumption, so the

portions acquired during the marriage should be reimbursed to the marital estate pursuant to section 503(c)(2) of the Act.

Ann also argues that the proceeds received from the sale of 830 Galena, $32,870.19, and the $20,000 she had in Merrill Lynch account No. 6262134 should also be designated as nonmarital property. The trial judge found that the proceeds from the sale of 830 Galena were deposited in Aurora Federal account No. 251605 and commingled with marital funds, thereby transmuting the proceeds into a marital asset. The money was later deposited in Merrill Lynch account No. 6262134. The trial judge made no finding concerning the $20,000 that allegedly existed in Merrill Lynch account No. 6262134 prior to the marriage, but determined that the account was a marital asset.

■ We hold that the trial court's finding that Merrill Lynch account No. 6262134 was marital property was not against the manifest weight of the evidence. Ann's assertion that the account was established before the marriage and contained $20,000 is not strongly supported by her testimony. Ann testified at the hearing on this issue as follows:

"Q. Let me show you Plaintiff's Exhibit No. 23 and ask you if you've seen that document before?

A. Yes, I provided it to you.

Q. Is that the document from which you ascertained [that the value of Merrill Lynch account No. 6262134] was $20,000.00 at the time you got married?

A. Yes.

Q. Why isn't it a fact that Plaintiff's Exhibit No. 23 is a document—

A. Not the date that I got married. You asked for 1981, so I didn't say date of marriage. You said 1981. So that's for 1981.

Q. But September 26, 1981, to October 30th, 1981, is the date that this document bears, isn't it?

A. Yes.

Q. And this is where you got your information that your account in your opinion was worth $20,000.00 on the day you got married?

A. Yes.

Q. You don't have any actual documents that show what the value was on the date you got married, is that correct?

A. No."

Our reading of the record shows that insufficient evidence was presented to establish the value of Merrill Lynch account No. 6262134 before the marriage or what assets were used to fund that account. The trial judge chose to disbelieve Ann's testimony, and it is not our function

to reassess the trial court's credibility findings. See *Durante*, 201 Ill. App. 3d at 382.

We also find, however, that the trial court erred in failing to reimburse Ann for $27,649.48 of the $32,870.19 of Ann's nonmarital proceeds from the sale of 830 Galena that were contributed to her Merrill Lynch accounts. Ann established that she kept the proceeds from the sale of 830 Galena in Aurora Federal account No. 251605 for only a month before beginning to transfer it to Merrill Lynch account No. 6262134 and its predecessor account No. 66146501. We have reviewed the monthly bank statements from Aurora Federal and determine that only $27,649.48 is traceable to the Merrill Lynch deposits.

Ann testified that a $20,000 check written to Merrill Lynch on April 29, 1983, and checks for $1,061.45 and $5,000 written to Merrill Lynch on June 8, 1983, were all traceable to the 830 Galena proceeds. Ann argues in her brief that a check for $5,408.57, written on March 8, 1983, was also to Merrill Lynch. However, the record reflects that the $20,000 check on April 29, 1983, was the first to Merrill Lynch. Before the $20,000 check was written, $3,684.55 of the 830 Galena proceeds had to be used between February 15 and March 15, 1983, to cover debits on account No. 251605. Between March 15 and April 15, 1983, an additional $519.54 was taken from the 830 Galena proceeds, as the other credits on the account failed to cover the debits by that figure. Between April 15 and May 15, 1983, an additional $1,017.25 of 830 Galena proceeds was needed to keep the account in the black *before* the $20,000 check was debited. So, Ann only had $27,649.48 of 830 Galena proceeds in the account when the first check to Merrill Lynch, for $20,000, was written.

The two checks written to Merrill Lynch on June 8, 1983, for $1,061.45 and $5,000 were fully traceable to the nonmarital 830 Galena proceeds. Ann also claims that a check written on March 29, 1984, to Merrill Lynch for $5,224.95 was directly traceable, but based on the monthly debits and credits of the account through March 1984, only $1,588.03 of 830 Galena proceeds remained in the account. Thus, Ann is entitled to a nonmarital reimbursement of $27,649.48.

■ Finally, Ann argues that the trial court erred by awarding 323 Flagg to Charles as nonmarital property when marital proceeds were used to improve it. Ann argues that $20,000 of marital property was used to rehabilitate 323 Flagg. As authority for this assertion, she cites her testimony at the hearings:

"Q. And how did Section 8 relate to the 323 Flag [*sic*] Street property after the marriage?

A. Section 8 is very strict with their requirements, and we had to rehabilitate the entire building to bring it up to code for Section 8 tenants. I mean, walls, floors, there was some—about some 20,000 put into it.

Q. And where did that money come from?

A. Out of the marital funds. Charles took it out of the business funds."

Charles testified that the funds used to rehabilitate 323 Flagg came from fire insurance proceeds. Because Ann must trace the reimbursable marital proceeds by clear and convincing evidence (Ill. Rev. Stat. 1989, ch. 40, par. 503(c)(2)), and because we will not disturb the credibility determination of the trial court (*Durante*, 201 Ill. App. 3d at 382), we find that the trial court did not err in awarding 323 Flagg to Charles as nonmarital property without reimbursement to the marital estate.

We choose not to discuss the classification of the remaining assets because Ann did not raise the issue of improper classification as to those particular assets and because we find that the trial court's classification as to those assets was not contrary to the manifest weight of the evidence. We do, however, discuss Ann's other contentions as they relate to the proper distribution of marital assets on remand.

Ann argues that a new trial should be granted to redetermine the values of many of the investment properties awarded to Charles. She claims that the properties should be valued at the time of the judgment. Ann posits that the trial court erred when it relied on the June 1989 stipulated values of the investment properties in its April 1991 judgment.

"Whether to reopen proof is a matter for the trial court's discretion, taking into account any excuse for the failure to introduce the relevant evidence at trial and any surprise or unfair prejudice to the opposing party; we will not disturb the court's decision absent a clear abuse of discretion and substantial injustice." (*In re Marriage of Feldman* (1990), 199 Ill. App. 3d 1002, 1006.) Assets are to be valued at the time of the judgment for dissolution of marriage. (*In re Marriage of Rubinstein* (1986), 145 Ill. App. 3d 31, 35.) However, it is the obligation of the parties to present the court with sufficient evidence of the value of the property. (*In re Marriage of Courtright* (1987), 155 Ill. App. 3d 55, 59.) Greater liberty should be allowed in reopening proofs when the case is tried before the court without a jury. *In re Marriage of Suarez* (1986), 148 Ill. App. 3d 849, 858.

■ We find that the trial court did not abuse its discretion when it denied Ann's post-trial request to reopen proofs. We recognize that there was nearly a two-year gap between the time proofs were closed in

August 1989 and when the judgment for dissolution was issued in April 1991. However, a large portion of this delay was due to the lack of diligence on the part of each party's attorney. On August 9, 1989, the last day of the hearings, the trial judge informed the parties that he wanted each side to submit trial briefs discussing the distribution and valuation of marital and nonmarital property. Charles, the petitioner, was given three weeks from the date he received the trial transcript to submit a brief. Ann was given three weeks to respond to that brief and Charles was given two weeks after that to reply to Ann's brief. In reality, Charles' initial brief was not filed until January 30, 1990. Ann's response brief was filed on June 5, 1990, and Charles' reply brief was filed on July 20, 1990.

We also recognize that the trial court contributed to the delay in this cause. The trial judge's letter opinion was not filed until March 12, 1991, and the judgment for dissolution of marriage was not filed until April 19, 1991. However, at no time during the nine-month delay before judgment did Ann file a motion to reopen proofs. It was only after the judgment had been rendered, and Ann had not received any of the investment properties, that she sought to reopen proofs. A poor precedent would be set if we were to remand for a new trial on valuation in this situation.

Ann argues that the assets should be valued at the time of the judgment. We agree. At the time the trial court made its decision, the only valuation evidence that had been presented was the stipulated values of the properties. It is the parties' obligation to present evidence of the value of property. (*Courtright*, 155 Ill. App. 3d at 59.) Here, the trial court made its decision based on the only evidence that was presented, and we hold that the trial court did not err in using the valuations submitted.

The cases cited by Ann on the issue of valuation are distinguishable. In *In re Marriage of Suarez* (1986), 148 Ill. App. 3d 849, the husband made a motion to reopen proofs *before* the judgment was entered. (*Suarez*, 148 Ill. App. 3d at 857.) In effect, the trial court was on notice before the judgment was entered that circumstances had changed between the time proofs were closed and the entry of the judgment. Our reading of the record in this case shows that the trial judge had only the stipulated values to consider in rendering the judgment. Neither party presented the trial court with a motion or sufficient evidence to justify reopening proofs before the entry of the judgment.

The case of *Rubinstein* (145 Ill. App. 3d 31) was a situation where the trial court valued the husband's stock holdings nine months before the dissolution. However, the dissolution judgment was entered on Jan-

uary 24, 1984, and the trial on the issues of custody, support and maintenance was reserved for a later date. (*Rubinstein*, 145 Ill. App. 3d at 32.) The trial court's supplemental judgment on July 19, 1984, was entered, setting forth the distribution of property and determination of support. (*Rubinstein*, 145 Ill. App. 3d at 32.) The reviewing court reversed and remanded because the husband's stock was valued based on its book value on April 30, 1983. The court stated that the stock should have been valued as of January 24, 1984, the date of the original judgment for dissolution. *Rubinstein*, 145 Ill. App. 3d at 35.

The sequence of events in our situation makes the *Rubinstein* case inapplicable. Here, the trial on the issues of valuation and property distribution was held *before* the judgment for dissolution. Also, the valuation problem in *Rubinstein* was not a result of a delay from the time of the hearings to the time of the judgment. The trial court in *Rubinstein* chose an improper point in time to value the stock. The trial court here valued the property at the time it rendered the judgment based on the only evidence that was before the court, the stipulated values.

Finally, Ann relies on *In re Marriage of Reib* (1983), 114 Ill. App. 3d 993. There, the trial court distributed property without evidence of the value of certain subsidiary companies owned by the husband. The husband owned a holding company, whose principal asset was an insurance company. It was stipulated at trial that the value of the insurance company was zero, but no evidence was presented as to the value of the other assets held by the holding company. *Reib*, 114 Ill. App. 3d at 999.

In the case at bar, the trial court did not distribute property that had not been designated a value. All of the property Ann claims must be revalued had a stipulated value which the judge relied upon when deciding the distribution of assets. Thus, the *Reib* case is distinguishable on its facts.

In addition to our previously discussed reasons for affirming the trial court's denial to reopen proofs, we note that Ann argues that the investment properties awarded to Charles should be revalued, but she ignores the fact that the assets she received, more than likely, also increased in value during the 20-month period between the hearings and the judgment. She was awarded pension plans, savings plans, stock and real property, some or all of which have assumably also increased in value.

Ann's final contention is that the distribution of assets was grossly unfair and contrary to the factors listed in section 503(d) of the Act (Ill. Rev. Stat. 1989, ch. 40, par. 503(d)). The trial court has broad discretion on matters of property distribution which will not be disturbed absent an abuse of discretion. *In re Marriage of Ryan* (1985), 138 Ill. App. 3d 1077, 1080.

Because the trial court failed to properly classify certain property as nonmarital, the case will be remanded for a redistribution of marital assets. Thus, we need not discuss whether the distribution of assets was equitable. However, we will address Ann's contention that Charles dissipated marital assets. She claims that Charles' selling and mortgaging of investment properties and placing them in trust to secure a $70,000 line of credit was dissipation. Ann also claims that Charles cannot adequately account for the $70,000 obtained by the Aurora National Bank.

Dissipation is defined as the use of marital property for the sole benefit of one spouse for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown. (*In re Marriage of O'Neill* (1990), 138 Ill. 2d 487, 491.) A party charged with dissipating marital assets is obligated to establish by clear and convincing evidence how the funds were spent. (*In re Marriage of Bush* (1991), 209 Ill. App. 3d 671, 676.) "General and vague statements that the funds were spent on marital expenses or to pay bills are inadequate to avoid a finding of dissipation." (*In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 1022.) A finding concerning dissipation will not be disturbed unless against the manifest weight of the evidence. *In re Marriage of Rai* (1989), 189 Ill. App. 3d 559, 565.

The trial court made a finding that neither party had dissipated assets. Each party had charged the other with dissipation. The trial court's analysis on this issue focused primarily on Charles' charge of dissipation because, according to the trial judge, it was the "more serious claim." Charles claimed that Ann violated an injunction entered on November 15, 1987, by disposing over $38,000 from her Aurora Federal Savings account No. 251605. Ann's testimony that she used the funds for daily living expenses was sufficient to overcome the dissipation claim.

■ We find that the trial court's decision that Charles did not dissipate assets was not against the manifest weight of the evidence. Charles' testimony sufficiently detailed the tracing of funds from the sale of investment properties. Charles made his living by selling and re-investing in real estate. We do not expect that he would cease business operations and cease paying his daily living expenses during these proceedings. Also, most of the money that Charles received from the sale of property was used to purchase new properties and pay the debts of other marital properties at a time when Charles did not know if he was going to be awarded the property upon judgment. Charles sold 202-204 Schiller for $77,000. All but $11,756 was used to pay off debts related to the real estate ventures with the Aurora National Bank. Charles also testified that the $11,756 was deposited in his real estate checking account and used to continue his rehabilitation projects. This was a contin-

ual process of selling, paying off debts and reinvesting in real estate, not the selling of marital assets for his sole, personal benefit.

Charles also sold 918 Kane for $31,000. After some confusion, Charles testified that the $31,000 was spent as follows: $2,500 went into his real estate account to pay bills; $4,076.20 to pay a junior mortgage with Aurora National Bank; $1,094 to pay a mortgage on another property; $2,000 for attorney fees; $70 for a doctor's bill; $2,000 to purchase equipment for the salon; $190 to pay for work done on 1918 Kane; $394 for his daughter's (from a previous marriage) tuition; $75 to secure housing; $20 for a charitable donation; $402 to Aurora National to pay a mortgage payment; $2,400 to pay for moving the house from 915 Fenton; $270 to computer consultants; $2,500 for use in the salon bank accounts; $3,313.85 to purchase 737 Kane; $885 to purchase materials for 1018 Kane; $1,000 to purchase 910 Kane; and $3,200 as a second payment to move 915 Fenton. Although these figures do not equal $31,000, we believe Charles provided sufficient detail in tracing the funds from the sale of 918 Kane such that the trial court's determination that Charles did not dissipate assets is not against the manifest weight of the evidence.

Ann argues that Charles did not account for rent received from 120-124 State, but we find that his testimony was adequate. Charles stated that the rent is deposited in his real estate account and used to reinvest in other property, pay utilities and maintain the properties. Ann also argues that Charles dissipated the $70,000 line of credit with Aurora National because he failed to account for how that money was spent. We do not recognize a line of credit as a marital asset. Charles is responsible for repaying the money used from the line of credit. As such, the dissipation analysis does not apply to the $70,000 line of credit.

The cases cited by Ann to support her dissipation argument are distinguishable. In *In re Marriage of Partyka* (1987), 158 Ill. App. 3d 545, the husband testified that he thought he gave $5,000 to his wife while she testified that she never received the money. (*Partyka*, 158 Ill. App. 3d at 550.) The husband also testified that a $14,000 commission check was used to pay "a lot of bills," but that he did not know "specifically" what he did with the check. (*Partyka*, 158 Ill. App. 3d at 550.) The husband's testimony in *Partyka* was filled with vague generalities, while in this case, Charles gave a reasonably detailed description with regard to the distribution of cash from the sale of property.

The remaining cases relied upon by Ann also reflect a lack of specificity by the alleged dissipator in explaining expenditures, which is simply not the case in our situation. *Szesny v. Szesny* (1990), 197 Ill. App. 3d 966, 972 (husband claimed that money was spent for "family ex-

penses," but could not produce detailed evidence of expenditures); *In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 1022 (husband testified that $14,000 received from sale of real property was "spent, I guess"; that some money was used to pay bills which he could not recall; and that part of $32,700 received from cashing a certificate of deposit was spent on vacations with his girlfriend).

■ As a final matter, we note Ann's argument that she never received one-half of the net proceeds from the sale of 202-204 Schiller. The trial court ordered Charles to pay Ann one-half of $11,756.02. The trial court, upon remand, should consider this order when redistributing marital assets.

We reverse the trial court's classification of certain marital property and remand for a redistribution of marital assets. The trial court should use the same values for the assets that were used in its letter opinion of March 21, 1991. No additional hearings are needed to determine classification, dissipation or valuation. The trial court should redistribute marital assets based on the following chart:

*Nonmarital Property*

| | | |
|---|---|---:|
| Charles: | Phillips Hair Studio along with inventory and bank account value | $35,000.00 |
| | 323 Flagg, Aurora, Illinois | 14,000.00 |
| | | |
| Ann: | Merrill Lynch account No. 62621707 | $ 3,889.00 |
| | AT&T Pension Plan, nonmarital portion | 12,188.00 |
| | AT&T Savings Plan, nonmarital portion | 58,782.97 |
| | AT&T Stock Plan, nonmarital portion (valued on June 12, 1989) | 69.108 shares |
| | Merrill Lynch account No. 6262134 | 27,649.48 |

*Marital Property*

| | |
|---|---:|
| 1131 E. New York, Aurora | $ 68,500.00 |
| 575 Apache, Batavia | 110,500.00 |

Beneficial interest in Aurora National Bank Trust No. 52370 including properties at 120/124 State Street; 1128 East New York Street; 202-204 Schiller, Aurora, Illinois; 1018 Kane Street, Aurora, Illinois; 737 Kane Street, Aurora, Illinois; less individual mortgages on said premises and Aurora National Bank line of credit in the approximate amount of $70,000 which said mortgages and line of credit Charles Phillips shall assume and be solely

| | |
|---|---|
| obligated to pay and shall indemnify and hold Wife harmless therefrom | 53,871.98 |
| Charles Phillips IRA account | 4,300.00 |
| 1986 Nissan automobile | 9,000.00 |
| Aurora Federal account No. 208311-1 | 3,404.06 |
| Aurora Federal account No. 205359-3 | 1,177.34 |
| 1986 Van | 500.00 |
| Used barber and beauty chairs | 2,000.00 |
| AT&T ESOP, marital portion (valued as of June 12, 1989) | 68.574 shares |
| Merrill Lynch account No. 6262134 | $ 32,442.52 |
| AT&T Savings Plan, marital portion | 94,280.37 |
| AT&T Pension Plan, marital portion | 10,191.00 |
| Merrill Lynch account No. 626-85255 | 19,935.79 |
| Aurora Federal account No. 251605 | 6,018.48 |
| Putnam Health Services account | 12,500.00 |
| 20H Manchester, Freehold, New Jersey | 20,000.00 |
| Old Second National Bank account No. 28322 | 800.00 |
| 1983 Buick automobile | 1,500.00 |

For the foregoing reasons, the judgment of the circuit court of Kane County is reversed in part, and the cause is remanded for the redistribution of marital property.

Reversed and remanded.

DUNN and BOWMAN, JJ., concur.